EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Garib Bazaín, Jorge<br><br>        Recurrido<br><br>                v.<br><br>Hospital Español Auxilio Mutuo de Puerto Rico, Inc.; Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc.; Dr. José A. Isado Zardón y la Sociedad de Bienes Ganaciales compuesta con la Sra. Diana Vigil Vigil<br><br>        Peticionaria | Certiorari<br><br><br>2020 TSPR 69<br><br>204 DPR _____ |

Número del Caso:  CC-2018-0530


Fecha:  27 de julio de 2020


Tribunal de Apelaciones:

    Región Judicial de San Juan-Caguas


Abogados de la parte peticionaria:

    Lcda. Iris M. Monrouzeau Bonilla
    Lcdo. Pedro J. Manzano Yates
    Lcdo. Gilberto C. Ramos Martínez



Abogado de la parte recurrida:

    Lcdo. Enrique J. Mendoza Méndez




Materia:  Derecho Constitucional y Derecho Laboral: La cualidad de exconvicto de una persona no está subsumida en la categoría de origen o condición social protegida por la Constitución o por la legislación que prohíbe el discrimen en el empleo.



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Garib Bazaín, Jorge

      Recurrido

        v.

Hospital Español Auxilio
Mutuo de Puerto Rico, Inc.;
Sociedad Española de Auxilio
Mutuo y Beneficencia de Puerto
Rico, Inc.; Dr. José A. Isado
Zardón y la Sociedad de Bienes
Gananciales compuesta con la
Sra. Diana Vigil Vigil

      Peticionarios

**Núm.** CC-2018-0530

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 27 de julio de 2020

El presente caso nos brinda la oportunidad de interpretar y delimitar los contornos de la contraparte estatutaria de nuestra cláusula constitucional que prohíbe el discrimen por condición social. Específicamente, la controversia ante nuestra consideración exige que determinemos si una denegatoria de privilegios médicos por parte de un hospital fundamentada en la cualidad de exconvicto del solicitante constituye el tipo de discrimen por condición social proscrito por la Ley Núm. 100 de 30 de junio de 1959, *infra*.

**I.**

El 25 de marzo de 2010, el Dr. Jorge Garib Bazain presentó una demanda de sentencia declaratoria, *injunction* y daños y perjuicios en contra del Hospital Auxilio Mutuo

(Hospital), la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc. (Sociedad), el Dr. José A. Isado Zardón y la Sociedad de Bienes Gananciales compuesta por éste y la Sra. Diana Vigil Vigil (peticionarios). En ésta, alegó que se le habían denegado privilegios médicos de manera discriminatoria e ilegal por su condición de exconvicto y que se le había violentado su derecho a un debido proceso de ley durante el proceso de revisión que culminó en la denegatoria de esos privilegios. Conjuntamente, el doctor Garib presentó una solicitud de entredicho preliminar y permanente.

Específicamente, el doctor Garib adujo que la reglamentación del Hospital que rige los procesos de concesión y denegatoria de privilegios médicos era contraria a la legislación federal que establece los requisitos de debido proceso de ley con los que deben cumplir los hospitales al negarle privilegios a un facultativo médico. Según expuso, en el proceso de evaluación de su solicitud, el Hospital incumplió con todos los requisitos dispuestos en el *Health Care Quality Improvement Act*, 42 USC sec. 11101 *et seq*. Sobre este particular, arguyó que el Hospital no celebró una vista evidenciaria y que la decisión se tomó sin que se realizara un esfuerzo razonable para obtener toda la información necesaria. Asimismo, sostuvo que el Hospital no produjo oportunamente la prueba que le fue solicitada, tal y como la copia de la reglamentación en la que fundamentó su determinación. Véase Demanda, Ap. en las págs. 123-125.

El doctor Garib también planteó que la determinación del Hospital constituía discrimen por razón de convicción criminal previa y violentaba su derecho constitucional a la rehabilitación.[1] A esos efectos, interpretó que ser un exconvicto era una categoría protegida por la Sección 1 de la Carta de Derechos de nuestra Constitución que prohíbe el discrimen por condición social. Alegó que tal discrimen también era contrario a la Sección 19 del Artículo VI de la Constitución que consagra el compromiso con propender a la rehabilitación moral y social de los exconvictos. Por último, sostuvo que, en el ámbito laboral, discriminar por razón de una convicción penal previa era una actuación contraria al derecho constitucional al trabajo y a gozar de un nivel de vida adecuado. *Véase id*. en las págs. 125-26.

El 10 de octubre de 2011, luego de celebrar varias vistas para dirimir la procedencia del remedio interdictal preliminar solicitado, el Tribunal de Primera Instancia emitió una sentencia parcial denegando el mismo. Mediante esta sentencia parcial, en esencia, el foro primario concluyó que el doctor Garib no había presentado prueba suficiente que justificara la expedición de un *injunction* preliminar. El Tribunal de Apelaciones confirmó el dictamen del Tribunal de Primera Instancia y concluyó que ese foro fue consciente de la etapa de los procedimientos al evaluar

---

[1] El doctor Garib fue convicto a nivel federal por los delitos de fraude, apropiación y malversación de fondos públicos. Véase *U.S. v. Dubon-Otero*, 292 F.3d 1 (2002).

la prueba presentada. El foro apelativo intermedio advirtió que tal proceder le reconoció al doctor Garib amplia latitud para probar las causas de acción que quedaron pendientes y que, por tanto, no constituía cosa juzgada. *Véase Sentencia del TA*, en las págs. 36-38. El recurso de *certiorari* que el doctor Garib presentó ante este Tribunal para revisar esa determinación fue denegado.

Así las cosas y luego de múltiples trámites procesales, el 20 de junio de 2014 el doctor Garib presentó una moción solicitando autorización para enmendar su demanda, acompañada por una *Demanda Enmendada* ante el Tribunal de Primera Instancia. Justificó las enmiendas en la presunta conducta ilegal del Hospital al reportar actos no reportables al *National Practitioners Data Bank*. Según indicó, el Hospital había reportado de forma vaga e imprecisa los fundamentos de la denegatoria de privilegios a esa entidad y erróneamente había incluido información sobre conducta pasada que no cumplía con los parámetros de conducta reportable. El foro primario denegó las enmiendas solicitadas pero el Tribunal de Apelaciones revocó tal determinación.

El 10 de noviembre de 2015, el Hospital y los demás demandados presentaron una *Moción en Solicitud de Sentencia Sumaria* mediante la cual solicitaron la desestimación de la reclamación del doctor Garib en su totalidad. Arguyeron que, conforme a las determinaciones de hecho consignadas en la sentencia parcial del Tribunal de Primera Instancia que

denegó el remedio interdictal preliminar, la única causa de acción pendiente era una por daños y perjuicios. Sostuvieron que, en cuanto a esa causa de acción, les cobijaba la inmunidad dispuesta en el *Health Care Quality Improvement Act* para todos aquellos que participen en un proceso de evaluación de una solicitud de privilegios médicos.

El doctor Garib, por su parte, presentó una *Oposición a la Moción de Sentencia Sumaria* en la cual sostuvo que la sentencia parcial del Tribunal de Primera Instancia no constituía cosa juzgada, en tanto y cuanto ese foro se limitó a considerar la procedencia del remedio de *injunction* preliminar y no las causas de acción de discrimen y violaciones al debido proceso de ley. En cambio, arguyó que lo que sí constituía cosa juzgada era la Resolución de la Junta de Licenciamiento y Disciplina Médica de Puerto Rico mediante la cual se determinó que la conducta delictiva por la cual se le habían denegado los privilegios médicos al doctor Garib no estaba relacionada con su conducta profesional. Consiguientemente, solicitó al foro primario que denegara la solicitud de sentencia sumaria presentada y dictara sentencia a su favor determinando que: (1) al doctor Garib no se le había provisto un debido proceso de ley y (2) la denegatoria de privilegios médicos fue discriminatoria por razón de su condición social de exconvicto. Así, solicitó que se ordenara el retiro de la notificación realizada al *National Practitioner Data Bank*, la concesión inmediata de

privilegios médicos y la celebración de una vista para determinar la cuantía de los daños causados.

El 10 de marzo de 2016, el Hospital presentó la réplica correspondiente. En ésta, reiteró los argumentos esgrimidos en su solicitud inicial e insistió en que la sentencia parcial emitida por el Tribunal de Primera Instancia ya había adjudicado las causas de acción por discrimen y violaciones al debido proceso de ley al denegar el *injunction* preliminar. Contendió, además, que los hechos que el doctor Garib alegaba estaban en controversia se fundamentaban en meras alegaciones y no en evidencia que los controvirtiera. En cuanto a la aplicabilidad del *Health Care Quality Improvement Act*, planteó que dicho estatuto federal se limitaba a dotar de inmunidad a todas aquellas personas que participaran en un proceso de evaluación de privilegios médicos y que no creaba una causa de acción privada para exigir la reinstalación de privilegios o la revocación de notificaciones al *National Practitioner Data Bank*.

Evaluados los argumentos de las partes, el Tribunal de Primera Instancia dictó una sentencia parcial y declaró ha lugar la demanda presentada por el doctor Garib. Cónsono con esto, ordenó al Hospital extender inmediatamente los privilegios médicos al doctor Garib, retirar el informe previamente sometido al *National Practitioner Data Bank* e informar a esa entidad sobre la extensión de los privilegios que habían sido denegados. Al así resolver, el foro primario concluyó que el Hospital y los demás demandados habían

discriminado en contra del doctor Garib por razón de sus convicciones previas, lo que constituía discrimen por condición social. Asimismo, el Tribunal de Primera Instancia dictaminó que al doctor Garib se le había violentado su derecho a un debido proceso de ley, puesto que el Hospital no celebró una vista evidenciaria ni le suplió la documentación necesaria para defenderse.

El Tribunal de Apelaciones confirmó la sentencia parcial dictada por el foro de instancia. En esencia, concluyó que, contrario a lo alegado por el Hospital, la doctrina de la ley del caso era inaplicable porque las determinaciones realizadas al conceder o denegar un *injunction* preliminar no son obligatorias para la resolución del caso en su fondo. En cuanto a la controversia relacionada con el debido proceso de ley, el Tribunal de Apelaciones concluyó que el proceso mediante el cual se le denegaron los privilegios médicos al doctor Garib fue contrario a lo que exige el *Health Care Quality Improvement Act* y a los *Bylaws* del Hospital. Ello, puesto que no se le entregó al doctor la prueba relevante y material en la que se basó la determinación adversa. Además, razonó que la exigencia contenida en los *Bylaws* del Hospital mediante la cual se le requirió al doctor Garib negar específicamente todos los fundamentos en los que se basó la denegatoria como condición para la celebración de una vista evidenciaria era irrazonable y contraria a la ley federal.

Por último, y en lo relativo a la causa de acción de discrimen por condición social, el Tribunal de Apelaciones concluyó que "la convicción del Dr. Garib, fue un elemento determinante en el proceso seguido [. . .] para denegar su solicitud de privilegios médicos en el Hospital". *Sentencia del TA*, en la pág. 19. En cuanto a esto, el foro apelativo intermedio advirtió que, si bien la sentencia dictada por este Tribunal en el caso de *Rosario v. Toyota*, 166 DPR 1 (2005), no era vinculante, sí constituía una fuente persuasiva de derecho. Por tanto, razonó que al denegar los privilegios médicos por razón de las convicciones previas del doctor Garib, el Hospital había discriminado en su contra.

De ese dictamen del Tribunal de Apelaciones recurrieron los peticionarios ante este Tribunal mediante un recurso de *certiorari* presentado el 1 de junio de 2018. En éste, plantearon -como primer señalamiento de error- que el Tribunal de Apelaciones erró al concluir que el Hospital había discriminado en contra del doctor Garib por ser un exconvicto. Además, señalaron que el Tribunal de Apelaciones había errado al: (1) emitir conclusiones de derecho contrarias a las determinaciones basadas en prueba documental realizadas durante el procedimiento de interdicto preliminar; (2) ordenar la extensión de los privilegios médicos por la vía interdictal, y (3) concluir que la reglamentación del Hospital era contraria al *Health Care*

*Quality Improvement Act.*[2] Expedido el auto, las partes
presentaron sus respectivos alegatos.

La contención principal de los peticionarios es que
negarle los privilegios médicos al doctor Garib no
constituye el tipo de discrimen vedado por nuestra
Constitución. Curiosamente, sin embargo, afirman que la
determinación del Hospital no se fundamentó en las
convicciones previas del doctor Garib, sino en otra
evidencia que se utilizó para concluir que éste no cumplía
con los requisitos establecidos para extender a un
facultativo médico los privilegios solicitados. Los
peticionarios, además, arguyen que los dictámenes recurridos

---

[2] Los señalamientos de error son los siguientes:
  (1) Erró el Tribunal de Apelaciones al concluir
  que el Hospital discriminó contra el
  demandante-recurrido al momento de denegar su
  solicitud de privilegios médicos por razón de
  ser un ex-convicto.
  (2) Erró el Tribunal de Apelaciones al emitir
  una Conclusión de Derecho que es contraria a
  sus propias determinaciones previas basadas en
  prueba documental presentada durante el proceso
  de interdicto preliminar.
  (3) Erró el Tribunal de Apelaciones al emitir
  un interdicto que ordenó que el hospital
  restablezca los privilegios clínicos del
  demandante-recurrido y que retire la
  notificación del NPDB por ser contrario las
  determinaciones fundamentadas en prueba
  documental, por no haber aplicado los criterios
  estatutarios y jurisprudenciales para emitir
  ese tipo de orden extraordinaria y por no
  figurar el interdicto como parte de los remedios
  solicitados por el demandante-recurrido.
  (4) Erró el Tribunal de Apelaciones al concluir
  que los Bylaws del Hospital contenían un
  procedimiento contrario a la legislación
  federal conocida como Health Care Quality
  Improvement Act y por consiguiente haberle
  violentado el debido proceso de ley al
  demandante-recurrido.

son contrarios a las determinaciones realizadas por el tribunal de instancia -según éstas fueron confirmadas por el Tribunal de Apelaciones- que denegaron el remedio de interdicto preliminar. Sostienen que, mediante dichos dictámenes, los foros recurridos ya habían concluido que el Hospital no había discriminado en contra del doctor Garib y que había cumplido con los requisitos del debido proceso de ley al evaluar su solicitud. Dado que se le garantizó al doctor Garib un debido proceso de ley, afirman estar protegidos por la inmunidad provista por el *Health Care Quality Improvement Act*, por lo que procede desestimar la causa de acción de daños y perjuicios en su contra.

El doctor Garib, por su parte, arguye que la determinación del Hospital sí estuvo fundamentada en su condición de exconvicto, puesto que los otros incidentes a los que aludió el Hospital al denegar los privilegios eran remotos y ni tan siquiera habían conllevado un proceso disciplinario en su contra. Alega que la reglamentación del Hospital expresamente declaraba la primacía del *Health Care Quality Improvement Act* en los procesos decisionales, por lo cual la exigencia de una carta contradiciendo específicamente los fundamentos de la denegatoria como condición previa a la celebración de una vista era contraria al requerimiento general de vista contenido en ese estatuto federal. Consiguientemente, reiteró que el proceso seguido había sido discriminatorio e ilegal.

Tanto de los alegatos presentados como de los dictámenes recurridos surge con evidente claridad que la controversia de umbral ante la consideración de este Tribunal se reduce a determinar si la cualidad de exconvicto de una persona constituye una categoría protegida por la cláusula constitucional que prohíbe el discrimen por condición social. Contando con el beneficio de la comparecencia de ambas partes, estamos en posición de contestar dicha interrogante.

## II.

Como cuestión de umbral, en *Rosario v. Toyota*, *supra*, por estar igualmente dividido, este Tribunal emitió una sentencia mediante la cual confirmó un dictamen del Tribunal de Apelaciones que había restituido una causa de acción por daños y perjuicios por discrimen por condición social previamente desestimada por el foro primario. En ese caso, el Sr. Wilfredo Rosario Díaz presentó una demanda de daños y perjuicios en la que alegó que Toyota Corporation Puerto Rico le había negado empleo por razón de las convicciones que aparecían en el certificado de antecedentes penales que se le exigió como parte del proceso de contratación. En la demanda, el señor Rosario solicitó que se declarara inconstitucional la Ley para autorizar a la Policía de Puerto Rico la expedición de Certificaciones de Antecedentes Penales, Ley Núm. 254 de 27 de julio de 1974, 34 LPRA sec. 1725 *et seq.*, puesto que la misma se había convertido en un

mecanismo que permitía discriminar en contra de los exconvictos en Puerto Rico.

El Tribunal de Primera Instancia desestimó la demanda presentada por el señor Rosario luego de concluir que las alegaciones contenidas en ésta no exponían una causa de acción que justificara la concesión de un remedio. El foro apelativo intermedio revocó esa determinación. Al así proceder, enmarcó la controversia de la siguiente manera: "si bajo los hechos del caso ante nuestra consideración procedía o no la desestimación de la demanda por no exponer una reclamación que justifique la concesión de un remedio". *Rosario Diaz v. Toyota De Puerto Rico*, KLAN0100787, 2002 WL 31003154, en la pág. 2 (2002).

Ante el dictamen desestimatorio del foro primario, el Tribunal de Apelaciones examinó lo dispuesto en la Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa y concluyó que una moción para desestimar "no ha de considerarse sólo a la luz de una causa de acción determinada y sí a la luz del derecho del demandante a la concesión de un remedio, cualquiera que éste sea". *Id.* en la pág. 3. Consiguientemente, y por entender que el señor Rosario podía ser acreedor de un remedio indeterminado, el foro apelativo intermedio revocó la sentencia desestimatoria del tribunal de instancia y devolvió el caso a ese foro para la continuación de los procedimientos. En los méritos, el Tribunal de Apelaciones no dirimió las controversias de índole constitucional planteadas. En otras palabras, no

determinó si una denegatoria de empleo por convicciones criminales previas constituía el tipo de discrimen que está vedado por nuestra Constitución.

La sentencia dictada por este Tribunal se limitó a confirmar la restitución de la reclamación incoada por el señor Rosario bajo el fundamento de que éste "podía ser acreedor en derecho a la concesión de un remedio". *Rosario v. Toyota*, 166 DPR 1, 2 (2005)(sentencia). Es decir, este Tribunal concluyó que -en ese caso y conforme a las alegaciones del señor Rosario- una desestimación al amparo de la Regla 10.2 era improcedente en Derecho. A pesar de esto, los integrantes de este Tribunal en aquel momento aprovecharon la oportunidad para adelantar sus criterios sobre los méritos del reclamo del señor Rosario. Esas expresiones, sin embargo, distan mucho de ser vinculantes para cualquier tribunal, máxime cuando la sentencia que las motivó ni tan siquiera constituye precedente.[3]

---

[3] A esos efectos, el inciso (d) de la Regla 44 de este Tribunal establece que "[e]n vista de que las sentencias no publicadas no estarán accesibles al público en general, se considerará impropio citar como autoridad o precedente ante cualquier foro una decisión de este Tribunal que no se haya emitido mediante opinión o que no haya sido publicada por el Colegio de Abogados o por el propio Tribunal". 4 LPRA Ap. XXXI-B. Véase además, *Rivera Maldonado v. ELA*, 119 DPR 74, 83 (1987) ("Como regla general '[l]as normas, así como la interpretación de cualquier disposición legal, la establece este Tribunal mediante dictamen sostenido por una opinión o por una opinión *per curiam*, en la cual se consideran ampliamente las cuestiones envueltas y se fundamentan con razonamientos, precedentes explicados y tratadistas reconocidos. El Tribunal resuelve un caso por sentencia cuando el mismo plantea cuestiones reiteradamente resueltas por este Tribunal. Una sentencia no establece norma, y menos revoca una establecida. La sentencia es la forma que utiliza el Tribunal para disponer lo más rápidamente posible del

Concluyentemente, pues, este Tribunal nunca se ha expresado en torno a si la denegatoria de empleo por razón de convicciones previas constituye un discrimen por condición social.

### III.

En lo pertinente a la controversia ante la consideración de este Tribunal, la Sección 1 del Artículo II de la Constitución prohíbe que se establezca "discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Ciertamente, la enunciación de estas categorías en el texto constitucional procuró responder a las diferencias ingénitas entre las personas con el fin prohibir clasificaciones basadas en ellas.[4] Así, la raza, el color, el sexo, el

---

enorme número de casos que tiene que resolver. Sólo intenta resolver la controversia entre las partes. Por eso es que los jueces de instancia no deben fundar sus fallos en dichas sentencias'".) (citas omitidas).

[4] El Informe de la Comisión de la Carta de Derechos evidencia que las categorías provistas responden a cualidades de carácter fortuito o accidental:

> El propósito de esta sección es fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. **La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura**. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que obliga a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.

nacimiento, el origen o condición social y la ideología política y religiosa configuran categorías de fácil tipificación e identificación inherentes a la naturaleza propia de todo ser humano. En ese sentido, esas categorías responden a circunstancias fortuitas, naturales y espontáneas de la humanidad y son consustanciales al mero hecho de ser y existir. En atención a ello, nuestra Constitución prohíbe que se utilicen esas clasificaciones para diferenciar, discriminar y excluir.

En el ámbito del Derecho privado, la ley que extiende estos principios al contexto laboral es la Ley contra el discrimen en el empleo, Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seq.* Esta legislación incorpora el lenguaje constitucional y establece responsabilidad civil y criminal para aquellos patronos privados que discriminen en el reclutamiento o en el empleo al crear una causa de acción de daños y perjuicios para el empleado discriminado. *Véase Díaz v. Windham Hotel Corp.*, 155 DPR 364, 381 (2001).

El artículo 1 de la referida ley dispone que cualquier patrono despida, suspenda **o de cualquier otra forma discrimine** contra un empleado -o incluso empleado potencial- por las causas que ahí se detallan. 29 LPRA sec. 146. Además, la legislación provee las herramientas legales necesarias para el resarcimiento de los daños que estas actuaciones

---

Informe de la Comisión de la Carta de Derechos, Diario de Sesiones Tomo 4, en la pág. 2562 (énfasis suplido).

puedan causar. *Véase García Pagán v. Shiley Caribbean, etc.,*122 DPR 193, 210 (1988).

En su concepción original, la Ley contra el discrimen en el empleo procuró extrapolar las categorías protegidas constitucionalmente a la esfera privada. En aquel momento, sin embargo, la preocupación principal de los legisladores fue incluir la edad como una categoría protegida. Por tal razón, la mayoría de los debates acaecidos durante las distintas sesiones legislativas giraron en torno a cómo se definiría o se interpretaría el término edad. El texto original de la ley enumeraba las siguientes categorías: edad avanzada, raza, color, religión, origen o condición social. *Véase* Ley Núm. 100 de 30 de junio de 1959, Leyes de Puerto Rico, Tercera Sesión Ordinaria, 1959.

Actualmente, el Artículo 1 de la Ley contra el discrimen en el empleo impone responsabilidad civil a

> Todo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su status de empleado, por razón de edad, según ésta se define más adelante, raza, color, sexo, orientación sexual, identidad de género, origen social o nacional, **condición social**, afiliación política, o ideas políticas o religiosas, o por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, o por ser militar, ex-militar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o por ostentar la condición de veterano del empleado o solicitante de empleo.

29 LPRA sec. 146 (énfasis suplido).

Nótese que la disposición vigente reconoce categorías que no están contempladas en el texto constitucional y que tampoco fueron concebidas al momento de redactar la ley en 1959. Así, con el paso del tiempo, las siguientes categorías han sido añadidas a la Ley contra el discrimen en el empleo mediante el mecanismo de enmiendas: (1) sexo; (2) orientación sexual; (3) identidad de género; (3) origen nacional; (4) afiliación política; (5) ideas políticas o religiosas; (6) ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho; (7) ser militar, exmilitar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o por ostentar la condición de veterano.

Es decir, en múltiples instancias, la Rama Legislativa ha estimado necesario incluir categorías adicionales que considera son vulnerables o marginadas en el ámbito laboral y, como tal, deben ser protegidas. Nótese, además, que -en su redacción original- la ley ataba el origen y la condición social, tal y como dispone la Sección 1 del Artículo II de nuestra Constitución. Enmiendas posteriores separaron ambos conceptos y agregaron a la palabra origen los calificativos "social o nacional".

La prohibición al discrimen por condición social ha existido en la Ley Núm. 100 desde su adopción en 1959, cuando las categorías fueron transpuestas del texto constitucional. No existe razón para concluir que la categoría de condición social en dicha legislación es sustantivamente distinta a

aquella protegida por la Constitución. De los diarios de sesiones de la Asamblea Legislativa tampoco surge una intención de distinguir entre la prohibición constitucional y la estatutaria. *Véase* Diario de Sesiones del Senado, Vol. 12, Tomo 4 (1959); Diario de Sesiones de la Cámara de Representantes, Vol. 12, Tomo 2 (1959).

En innumerables ocasiones, este Tribunal ha interpretado y aplicado prohibiciones de discrimen en sus distintas modalidades. En pocas instancias, sin embargo, ha tenido la oportunidad de interpretar y darle contenido a la categoría de condición social que origina la presente controversia. En *Perez, Roman v. Proc. Esp. Rel. de Fam.*, 148 DPR 201 (1999), se determinó que una clasificación entre parejas casadas y no casadas no constituía discrimen por origen o condición social. Al así resolver, se destacó que la expresión origen o condición social se refería a discrímenes económicos y sociales y no a distinciones razonables que puedan surgir del estado civil de las personas.[5] Expresiones ulteriores con relación a la categoría de origen o condición social se han dado en el contexto de opiniones concurrentes y disidentes o votos particulares.[6] La ausencia de extensa jurisprudencia interpretativa sobre esta categoría devela las dificultades inherentes a su exégesis y concepción.

---

[5] A igual conclusión se llegó en *Lopez v. ELA*, 165 DPR 280, 309 (2005).
[6] *Véase e.g. Berberena v. Echegoyen*, 128 D.P.R. 864 (1991) (J. Rebollo López, Op. Disidente); *Rosario v. Toyota*, *supra*.

La significación constitucional de lo que comprende la condición social de una persona tampoco surge claramente de las expresiones vertidas durante la Convención Constituyente. No obstante, al discutir el alcance de esta categoría protegida, las expresiones de nuestros constituyentes apuntan a que la inquietud principal de éstos se fundamentaba en consideraciones puramente socioeconómicas. Así, al indagar sobre el alcance de la prohibición constitucional de discrimen por origen o condición social, el delegado Fernández llamó la atención al hecho de que se había insertado la palabra "condición" después de la palabra "origen" y solicitó que se le explicara de qué manera se podía proteger o hacer valer esa categoría de discrimen. *Véase* 2 Diario de Sesiones de la Convención Constituyente, 1382 (1952).

El delegado Benítez, aclaró que la referencia a origen o condición social encarnaba el principio de "que no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal". *Id*. Posteriormente, el delegado González Blanes hizo constar su anuencia con eliminar la categoría de posición económica del texto propuesto por entender que la misma estaba comprendida en la categoría de origen o condición social. *Véase id*. en la pág. 2245.

Específicamente, el delegado indicó lo siguiente: "[n]os satisface la eliminación de 'posición económica', porque entiendo que ahí está incluida la dificultad que levanta el compañero Reyes Delgado al ponerse más adelante 'o condición social". *Id.*[7] Justamente, la categoría de posición económica fue eliminada de la propuesta por entender que la condición social abarcaba esa clasificación.

A pesar de que de los debates de los delegados no surgen ejemplos concretos de qué constituye un discrimen por condición social, las interpretaciones que hemos hecho de las distintas clasificaciones sospechosas, incluyendo aquella que hicimos de la categoría de condición social en *Perez, Roman v. Proc. Esp., supra,* develan que cualquier categoría protegida por la Constitución ha de ser -necesariamente- consustancial a la esencia de la persona objeto del discrimen y no un producto del libre albedrío o la voluntad de ésta. Así lo confirman las expresiones de este Tribunal en *Zachry International v. Tribunal Superior*:

> Con ello se intentan superar y sobrepasar los **accidentes circunstanciales que tengan origen en la naturaleza o en la cultura**. Es evidente que el sexo, al igual que la raza, constituyen rasgos que surgen en el ser humano por un **simple hecho fortuito**: el nacimiento; éste nada tiene que ver con la habilidad de la persona de oportunamente aportar y contribuir a los esfuerzos legítimos de una sociedad.

---

[7] Cónsono con esto, al interpretar esta categoría, el profesor Serrano Geyls señala que la misma está "íntimamente ligada a la Sec. 20 del Art. II que reconocía varios derechos económicos y sociales". R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1189.

*Zachry International v. Tribunal Superior*, 104 DPR 267, 281-82 (1975) (énfasis suplido).

De otra parte, las clasificaciones adicionales incorporadas a nuestro ordenamiento por la vía estatutaria han respondido a consideraciones de política pública que propenden a la protección de categorías que -como sociedad- hemos reconocido merecen mayores salvaguardas contra el discrimen. En el caso de la Ley Núm. 100, ésta ha sido enmendada en distintas ocasiones para ampliar su alcance e incluir nuevas categorías protegidas.

Así, en el 1972, se añadió la categoría de sexo con el objetivo principal de prohibir el discrimen en contra de las mujeres que se sumaban en grandes números a la creciente fuerza laboral. *Véase* Ley Núm. 50 de 30 de mayo de 1972. Posteriormente, en el 1983 se añadió el calificativo social o nacional después a la palabra origen para prohibir el discrimen por extranjería. *Véase* Ley Núm. 67 de 3 de junio de 1983. En el 1997, la Legislatura suprimió la palabra religión y la sustituyó por la categoría de afiliación política, ideas políticas o religiosas. Véase Ley Núm. 121 de 13 de septiembre de 1997. Tiempo después, en el 2006, se añadió la categoría de ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho con el fin de proteger a una población cada vez más vulnerable y demostrar un repudio a la violencia doméstica, cuya cifra en ese momento alcanzaba 22,635 incidentes anuales. *Véase Exposición de Motivos*, Ley Núm. 271 de 17 de diciembre de 2006.

De otra parte, en los años 2012 y 2014, se añadieron las categorías de militar, veterano, y la condición de haber servido en las fuerzas armadas de los Estados Unidos a la ley. Ello, por entender que se trataba de una población que podía ser objeto de discrimen a pesar de haber expuesto sus vidas en servicio de la milicia. *Véanse* Ley Núm. 232 de 13 de septiembre de 2012; Ley Núm. 104 de 23 de julio de 2014. Por último, en el año 2013, se incluyó la categoría de orientación sexual e identidad de género para "validar el mandato constitucional para garantizar la dignidad humana y la igual protección de las leyes, al prohibir utilizar la orientación sexual y la identidad de género de un ciudadano, como subterfugio para negar, restringir, limitar, obstruir o coartar la protección dispuesta en esta Ley". *Exposición de Motivos*, Ley Núm. 104 de 23 de julio de 2014.

De esta manera, pues, durante las últimas seis décadas a partir de su aprobación, la Ley Núm. 100 que prohíbe el discrimen en el empleo ha sido enmendada en al menos nueve ocasiones para aclarar el alcance de las categorías protegidas o incluir nuevas categorías en su ámbito de protección. Ninguna de estas enmiendas ha resultado en la inclusión de los exconvictos como una categoría protegida dentro de la fuerza laboral privada.

En múltiples instancias, sin embargo, se han presentado en la Legislatura proyectos de ley para crear una causa de acción de discrimen por la condición de exconvicto y ninguno de ellos ha prosperado. *Véanse* P. del S. 372 de 8 de marzo

de 2017; P. del S. 1212 de 8 de octubre de 2014; P. del S. 1730 de 26 de agosto de 2010. De hecho, el proyecto de ley más reciente expresamente dispuso que en nuestro ordenamiento jurídico no se reconocía la condición de exconvicto como una categoría protegida bajo la prohibición del discrimen por condición social.

Específicamente y de gran pertinencia a la controversia planteada en este caso, en la Exposición de Motivos del P. del S. 372, presentado con el propósito de crear la Ley contra el discrimen por condición social de exconvicto se advirtió lo siguiente:

> Por su parte, el Tribunal Supremo de Puerto Rico, por voz del Juez Asociado Señor Rebollo López, expresó en el caso de Rosario v. Toyota que "la condición de ex convictos es un tipo de condición social protegid[a] por nuestra constitución" y que no reconocerlo "equivaldría a negar que tradicionalmente en Puerto Rico se ha marcado a los ex convictos con el "carimbo de la potencial reincidencia" y se les ha marginado de múltiples facetas de la sociedad —la laboral, por ejemplo— a pesar de haber pagado su deuda con la comunidad". Sin embargo, debido a los resultados de la votación final entre los Jueces del Tribunal Supremo, este caso no fue fuente de derecho vinculante en cuanto al discrimen por ser exconvicto se refiere.

Exposición de Motivos del P. del S. 372 de 8 de marzo de 2017, en la pág. 2.

Más allá de la ausencia de un acto afirmativo por parte de la legislatura para prohibir el discrimen por convicciones previas, o incluir una categoría a esos efectos, otra legislación vigente revela que la cualidad de exconvicto sí puede ser considerada por un patrono al momento de contratar a un empleado. A modo de ejemplo, la Ley para

Autorizar a la Policía de Puerto Rico la Expedición de Certificados de Antecedentes Penales, Ley Núm. 254 de 27 de Julio de 1974, según enmendada, autoriza la expedición de certificados de buena conducta por parte de la Policía.[8]

Al enmendar esta ley para también facultar a la Policía y al Departamento de Corrección y Rehabilitación para expedir un certificado de rehabilitación y capacitación laboral, la legislatura reconoció que la ley "facilita información de extrema importancia a patronos prospectivos, incluyendo al Estado, sobre el historial personal de sus empleados, la cual tiene la función de indicar razonablemente al patrono sobre la integridad del carácter

---

[8] Como se adelantó, la Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico, Ley Núm. 8 de 4 de febrero de 2017, a pesar de prohibir expresamente el discrimen por condición social en su Sección 2.1, 3 LPRA sec. 1469a, impone los siguientes requisitos a todo candidato que interese ingresar al servicio público:

> e. no haber sido convicto por delito grave o por cualquier delito que implique depravación moral;
> (. . .)
> h. no haber sido destituido del servicio público, ni convicto por los delitos graves o menos graves que se enumeran en la Sección 6.8 (3) de esta Ley, en la jurisdicción de Puerto Rico, en la jurisdicción federal o en cualquiera de los demás estados de los Estados Unidos de América. Las condiciones identificadas de la (d) a la (h) no aplicarán cuando el candidato haya sido habilitado por el Departamento del Trabajo y Recursos Humanos para ocupar puestos en el servicio público.

3 LPRA sec. 1472c.

Sin lugar a duda, una lectura integrada de estas disposiciones revela que la legislatura considera que la cualidad de exconvicto no está subsumida en la categoría de condición social.

de estos, basándose en conducta anterior y pública". Se indicó, además, que "[l]a importancia de este tipo de información radica en que los patronos son los responsables vicariamente por los actos culposos o negligentes de sus empleados". Ley Núm. 174 de 11 de agosto de 2011.

El Artículo 4 de la Ley Núm. 254, también establece un mecanismo para la eliminación de las convicciones luego del transcurso de un periodo de cinco años y el cumplimiento con los siguientes requisitos: (1) no haber cometido otro delito; (2) tener buena reputación en la comunidad, y (3) haberse sometido a la muestra requerida por la Ley del Banco de Datos de ADN. 34 LPRA sec. 1725a-2. De esta manera, la legislatura procuró potenciar la inserción de los exconvictos en la fuerza laboral y su consiguiente rehabilitación mediante la eliminación de convicciones previas transcurrido el término dispuesto en ley.

A más de una década de la sentencia emitida por este Tribunal en *Rosario v. Toyota*, *supra*, y la irresolución generada por las expresiones divergentes de los integrantes de este Tribunal que derivaron de ella, la Rama Legislativa aún no le ha reconocido una causa de acción por discrimen laboral a los exconvictos de nuestro País. Por el contrario, legislación tan reciente como la Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico prohíbe la contratación de exconvictos de delitos graves. El estigma que resulta de un expediente criminal en el ámbito laboral es innegable. No corresponde

a este Tribunal, sin embargo, establecer por *fiat judicial* una categoría protegida que ha sido expresamente descartada en distintas instancias por la propia Asamblea Legislativa.

La cualidad de exconvicto de una persona no está subsumida en la categoría de origen o condición social protegida por la Constitución o por la legislación que prohíbe el discrimen en el empleo. La situación o circunstancia de haber delinquido y haber sido convicto por los delitos cometidos no está determinada por el origen y la condición social de una persona. Por el contrario, la cualidad de exconvicto responde únicamente a un acto volitivo y consciente de un ser humano que no es producto de su naturaleza ni es atribuible a un accidente o a una causa fortuita. Se trata más bien de una cualidad autoinfligida que no es exclusiva de una clase social o económica determinada.[9] Por tal razón, erraron los foros recurridos al concluir que la denegatoria de privilegios médicos al doctor Garib por razón de sus convicciones previas constituyó el tipo de discrimen por condición social vedado

---

[9] A nivel federal, se ha propuesto aplicar la doctrina de impacto dispar ("disparate impact") bajo el Título VII de la Ley de Derechos Civiles de 1964 al momento de evaluar si la cualidad de exconvicto resulta en un discrimen vedado por esa legislación. En ese sentido, para que se entienda que se configura un discrimen, será necesario probar que la cualidad de exconvicto es más prevalente en una de las categorías protegidas en particular, como por ejemplo la raza. Véase Tammy R. Pettinato, *Employment Discrimination Against Ex-Offenders: The Promise and Limits of Title VII Disparate Impact Theory*, 98 MARQ. L. REV. 831 (2014); Allan G. King and Rod M. Fliegel, *Conviction Records and Disparate Impact*, ABA Journal of Labor & Employment Law Vol. 26, No. 3 (Spring 2011), en las págs. 405-426.

en nuestro ordenamiento. En ausencia de una causa de acción por discrimen, procedía desestimar su reclamación sin trámite ulterior.[10]

**IV.**

Por los fundamentos que anteceden, se revoca el dictamen del Tribunal de Apelaciones y se desestima la reclamación de daños y perjuicios incoada por el doctor Garib en contra del Hospital. Dado que la denegatoria de privilegios médicos no constituyó un acto discriminatorio o

---

[10] En cuanto a los demás señalamientos de error de los peticionarios, concluimos que -en virtud del dictamen que antecede- éstos no ameritan revisión por parte de este Foro. En cuanto al segundo señalamiento de error, conviene aclarar que las determinaciones de hechos de un tribunal al conceder o denegar un *injunction* preliminar no constituyen cosa juzgada para la resolución de las demás causas de acción que no son de carácter interdictal. *Véase* José A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da ed., Pubs. J.T.S., T. V, págs. 1681-1682. En lo que atañe al tercer y cuarto señalamiento de error, dado que ambos requieren la interpretación del *Health Care Quality Improvement Act*, resulta preciso destacar que dicho estatuto federal se limita a conferirle inmunidad a aquellos hospitales y facultativos médicos que participen de un proceso mediante el cual se le denieguen privilegios médicos a un solicitante. Para beneficiarse de tal inmunidad, la ley requiere que se cumplan ciertos requisitos relacionados con el debido proceso de ley. El incumplimiento con estos requisitos únicamente acarrea la pérdida de la inmunidad y no crea una causa de acción independiente para el médico que fue objeto de evaluación y contra quien se tomó una decisión adversa. Véase *Tirado-Menendez v. Hospital Interamericano de Medicina*, 476 F.Supp.2d 79, 80 (D. PR 2007); *Brown v. Medical College of Ohio*, 79 F.Supp.2d 840 (N.D. Ohio 1999; *Emlich v. OhioHealth Corp.*, 2018 WL 1870139 (S.D. Ohio 2018). Si bien es cierto que en este caso no se cumplieron con los requisitos dispuestos en la ley federal, ello no implica que el Hospital violentó el derecho a un debido proceso de ley del doctor Garib. Los parámetros de debido proceso de ley con los que se debe cumplir para ser acreedor de la inmunidad conferida por el *Health Care Quality Improvement Act* no constituyen un mínimo irreductible que obliga a las instituciones hospitalarias.

ilegal, se dejan sin efecto las órdenes dictadas para extenderle los privilegios médicos y revocar las notificaciones emitidas al *National Practitioner Data Bank*.

Se dictará sentencia de conformidad.


                              Anabelle Rodríguez Rodríguez
                                   Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Garib Bazaín, Jorge<br><br>Recurrido<br><br>v.<br><br>Hospital Español Auxilio Mutuo de Puerto Rico, Inc.; Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc.; Dr. José A. Isado Zardón y la Sociedad de Bienes Gananciales compuesta con la Sra. Diana Vigil Vigil<br><br>Peticionarios | **Núm.** CC-2018-0530 | |

SENTENCIA

San Juan, Puerto Rico, a 27 de julio de 2020

Por los fundamentos que anteceden, se revoca el dictamen del Tribunal de Apelaciones y se desestima la reclamación de daños y perjuicios incoada por el Dr. Jorge Garib Bazain en contra del Hospital. Dado que la denegatoria de privilegios médicos no constituyó un acto discriminatorio o ilegal, se dejan sin efecto las órdenes dictadas para extenderle los privilegios médicos y revocar las notificaciones emitidas al *National Practitioner Data Bank*.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez disiente con opinión escrita. El Juez Asociado señor Estrella Martínez disiente con opinión escrita. El Juez Asociado señor Colón Pérez disiente con opinión escrita. El Juez Asociado señor Kolthoff Caraballo no intervino.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Jorge Garib Bazaín<br><br>    Recurrido<br><br>        v.<br><br>Hospital Español Auxilio Mutuo<br>de Puerto Rico, Inc. y otros<br><br><br>    Peticionarios | CC-2018-0530 | |

La Jueza Presidenta ORONOZ RODRIGUEZ emitió una Opinión disidente

En San Juan, Puerto Rico, a 27 de julio de 2020

Ante una controversia que requiere interpretar la Carta de Derechos de nuestra Constitución, procede hacerlo de forma que garanticemos la vigencia, eficacia, plenitud y amplitud de los derechos que allí se consagran. Por consiguiente, al definir el contenido y alcance de la salvaguarda constitucional contra el discrimen por condición social -y de su contraparte estatutaria, en la Ley Núm. 100, infra- no podemos ser inconsistentes con tales principios ni establecer límites que destruyan su propósito y finalidad.

A pesar de que estos postulados básicos debieron guiar nuestro ejercicio interpretativo, una Mayoría de este Tribunal actúa a sus espaldas. Con tal acción,

restringe la garantía contra el discrimen por condición social basándose en consideraciones ajenas y contrarias a principios tan arraigados como la igualdad esencial de las personas y la inviolabilidad de la dignidad humana. Hoy la Mayoría deja desprotegidos a los exconvictos de delito, un sector de la población al que se le asigna un estatus social inferior como consecuencia de la marginación y el estigma con que la sociedad lo ha marcado históricamente. Rechazo ese curso de acción, pues, en lugar de fortalecer las garantías constitucionales de igualdad y dignidad humana, las debilita. Por eso, disiento.

I.

En Puerto Rico existe una política pública vigorosa dirigida a erradicar todo tipo de discrimen en nuestra sociedad. Santini Rivera v. Serv Air, Inc., 137 DPR 1, 12 (1994). Esta se origina en la Constitución de Puerto Rico, cuya primera sección de su Carta de Derechos establece de manera categórica que "no podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o **condición social**, ni ideas políticas o religiosas". Art. II, Sec. 1, Const. ELA, LPRA, Tomo 1 (Énfasis suplido). Esta prohibición constituye un valor jurídico de la más alta jerarquía en nuestro ordenamiento. Santini Rivera v. Serv Air, Inc., supra, pág. 13 n.4. Tal es

su importancia que la Asamblea Legislativa adoptó legislación que extiende el principio constitucional de no discriminación a las relaciones entre personas privadas. En esta línea, en el ámbito obrero-patronal, se adoptó la Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec. 146 et seq., conocida como Ley General contra el Discrimen en el Empleo en Puerto Rico (Ley Núm. 100). Esta legislación, la cual se aprobó pocos años después de que se ratificara la Constitución de Puerto Rico, prohíbe el discrimen en el empleo contra trabajadores o solicitantes de empleo basado en una serie de categorías o cualidades que se identifican en el estatuto, a saber: edad, raza, color, sexo, orientación sexual, identidad de género, origen social o nacional, **condición social**, afiliación política, ideas políticas o religiosas, ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, ser militar o exmilitar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o ser veterano. 29 LPRA sec. 146.

Como se observa, muchas de estas categorías corresponden con la cláusula antidiscrimen de nuestra Constitución. Esto se debe a que la Ley Núm. 100, supra, tuvo como objetivo principal extender el alcance de ese postulado constitucional al campo laboral y proteger a los empleados de la empresa privada contra todo tipo de discrimen.

Santini Rivera v. Serv. Air, Inc., supra, pág. 4. En otras palabras, a través de esta legislación, la Asamblea Legislativa formuló ciertos remedios para poner en vigor la cláusula antidiscrimen en el contexto obrero-patronal. Díaz v. Wyndham Hotel Corp., 155 DPR 364, 380 (2001) (citando a García Pagán v. Shiley Caribbean, etc., 122 DPR 193, 198 (1988)). Además, ratificó el principio constitucional de esencial igualdad humana, el cual sirve de base a la cláusula antidiscrimen. Díaz v. Wyndham Hotel Corp., supra, pág. 380.

En lo pertinente, al igual que nuestra Constitución, una de las modalidades de discrimen que proscribe la Ley Núm. 100, supra, es la de *condición social*. La controversia ante nosotros exige definir tal modalidad y determinar si esa categoría protege a las personas convictas de delito. Esta encomienda exige considerar la naturaleza y características de nuestra Carta de Derechos, los principios o postulados básicos en los que se cimenta y las normas que deben guiar su interpretación.

En primer lugar, hemos reconocido que en Puerto Rico "se quería formular una Carta de Derechos de factura más ancha que la tradicional, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos". Pueblo v. Figueroa Navarro, 104 DPR 721, 725 (1976) (citando a ELA v. Hermandad

de Empleados, 104 DPR 436, 440 (1975)). Es por eso que tanto la Declaración Universal de los Derechos Humanos como la Declaración Americana de los Derechos y Deberes del Hombre ejercieron una influencia significativa en la redacción de nuestra Carta de Derechos. Íd. El resultado de esa influencia fue la adopción de *"una de las cartas de derechos más liberales, más generosas y más auténticamente democráticas del mundo"*. Pueblo v. Santiago Feliciano, 139 DPR 361, 436 (1995) (Juez Asociado Rebollo López, Opinión disidente) (Énfasis en el original). Cónsono con la naturaleza liberal y abarcadora que caracteriza los derechos consagrados en la Carta de Derechos, la Sec. 19 del Art. II de la Constitución de Puerto Rico, LPRA, Tomo 1, establece un canon para su interpretación y señala, en lo pertinente: "La enumeración de derechos que antecede **no se entenderá en forma restrictiva** ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente".

Con relación a esta sección, la Comisión de la Carta de Derechos de la Convención Constituyente expresó que tiene como objetivo "proteger los derechos del individuo **contra una interpretación restrictiva**". 4 Diario de Sesiones de la Convención Constituyente 2576 (1961) (Énfasis suplido). También

explicó que, en aras de alcanzar ese objetivo, la Constitución está redactada en **términos amplios** y utiliza un lenguaje breve para enunciar los grandes principios que recoge, en lugar de una formulación minuciosa de detalles. Íd. Por su parte, durante la Convención Constituyente, el delegado Jaime Benítez, quien fuera presidente de la Comisión que redactó la Carta de Derechos, expuso que, conforme a la Sec. 19 del Art. II de la Constitución, "en la interpretación de estos derechos, **no se seguirá una actitud restrictiva**, sino que por lo contrario, **se las interpretará en su plenitud**". (Énfasis suplido) Diario de Sesiones, supra, pág. 1105. Por consiguiente, por disposición expresa de la Constitución **estamos obligados a realizar una interpretación liberal y expansiva de los derechos individuales que contiene la Carta de Derechos** –en lugar de una limitativa y restrictiva– con el fin de darles plenitud.

En segundo lugar, es indispensable recordar cuál es el principio rector y el pilar fundamental de los derechos individuales que reconoce la Constitución de Puerto Rico. La Carta de Derechos comienza con el enunciado claro y terminante: "[l]a dignidad ser humano es inviolable". Art. II, Sec. 1, Const. ELA, supra. El principio de la inviolabilidad de la dignidad humana es un "principio fundamental y rector

de **respeto** hacia todo individuo". <u>Díaz v. Wyndham Hotel Corp.</u>, supra, pág. 379. Previo a la aprobación de la Constitución, este derecho no contaba con un reconocimiento expreso en nuestro ordenamiento, sino que formó parte del grupo de derechos de naturaleza social y económica que la Constitución introdujo en nuestra jurisdicción. <u>García v. Aljoma</u>, 162 DPR 572, 581 (2004). La inclusión de este y otros derechos "respondió al entendimiento de que para el tiempo en que la Constitución de Puerto Rico se adoptó, los puertorriqueños habían demostrado persistentemente que tenían fe en los valores fundamentales de la tradición liberal, en la libertad y en **la dignidad del individuo como último punto de referencia valorativa para la organización social**" <u>Íd.</u>, pág. 582 (Énfasis suplido). Según afirmó el delegado Jaime Benítez en la Convención Constituyente:

> **Esta es la piedra angular y básica de la democracia.** En ella radica su profunda fuerza y vitalidad moral. Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, **del alto respeto que esa dignidad merita y la responsabilidad en consecuencia que tiene todo el orden constitucional de descansar en ella, protegerla y defenderla.** Por eso en nuestra primera disposición además de sentar inicialmente esta base de la igualdad profunda del ser humano—igualdad que trasciende cualquier diferencia, bien sea diferencia biológica, bien sea diferencia ideológica, religiosa, política

o cultural—por encima de tales diferencias está el ser humano en su profunda dignidad trascendente. Y por eso decimos que el sistema de leyes y el sistema de instrucción pública habrán ambos de encarnar estos principios válidos y eternos. Diario de Sesiones, supra, pág. 1103 (Énfasis suplido).

Cónsono con lo anterior, **todos** los derechos que la Carta de Derechos de nuestra Constitución reconoce y protege responden al principio fundamental de que la dignidad del ser humano es inviolable. Toll y Sucn. Rivera Rojas v. Adorno Medina, 130 DPR 352, 373 (1992) (Juez Asociado Fuster Berlingeri, Opinión disidente). Es por eso que toda interpretación de la Carta de Derechos se debe hacer en consideración y a la luz del derecho a la dignidad y su inviolabilidad, pues este es el pilar que sirve de base a los demás derechos que allí se consagran.

II.

Ahora bien, existe otro principio cardinal que permea todas las disposiciones de la Carta de Derechos y que tiene una relevancia particular: el principio de igualdad ante la ley. El principio de igualdad esencial surge como consecuencia del principio de dignidad, por lo cual están íntimamente atados. Diario de Sesiones, supra, pág. 2561. Este también se incluye en la primera sección de la Carta de Derechos y, no por casualidad, precede

inmediatamente a la prohibición del discrimen. Así, en la parte pertinente, la disposición constitucional lee: "[t]odos los hombres [y mujeres] son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Art. II, Sec. 1, Const. ELA, supra.

El derecho constitucional a la igual protección de las leyes se activa cuando el Estado "crea clasificaciones entre grupos, discriminando a unos frente a otros". Berberena v. Echegoyen, 128 DPR 864, 878 (1991). De ahí su relación estrecha con la prohibición del discrimen. Al examinar su aplicación en casos concretos, hemos precisado cuándo un trato desigual constituye el discrimen que la Constitución prohíbe. Así, hemos resuelto que no toda discriminación viola el principio de igualdad, ya que las normas que lo nutren no exigen que todos los ciudadanos reciban un trato igual, sino que prohíben un tratamiento desigual **injustificado, indebido, irrazonable u odioso**. Íd. En otras palabras, "la prohibición de todo discrimen por cualquier circunstancia personal o social, no implica la exclusión de cualquier diferenciación entre las personas por su condición sino **aquellas que carecen de justificación objetiva**". Almodóvar v. Méndez Román, 125 DPR 218, 234 (1990) (Énfasis suplido).

También hemos reconocido la existencia de un discrimen ilegal "cuando alguna persona sufre una desigualdad **por prejuicio** o por arbitrariedad, sin que exista un fundamento razonable para la falta de trato igual". <u>Meléndez v. Asoc. Hosp. del Maestro</u>, 156 DPR 828, 845 (2002) (Énfasis suplido). Como complemento de lo anterior, resulta imprescindible mencionar que:

> [h]ay áreas en las cuales, **por su tangencia con la dignidad humana y con el principio de que todo el mundo es igual ante la ley**, toda clasificación es inherentemente sospechosa y está sujeta al más minucioso examen judicial. Estas áreas incluyen las clasificaciones o discrímenes por motivo de raza, color, sexo, nacimiento, origen o **condición social**, ideas políticas o religiosas y nacionalidad" proscritos constitucionalmente. <u>Wackenhut Corp. v. Rodríguez Aponte</u>, 100 DPR 518, 531 (1972) (Énfasis suplido).

Estas clasificaciones se denominan sospechosas "porque frecuentemente la característica en que se basa la clasificación **no guarda relación con la habilidad o aptitud de las personas afectadas** por la clasificación". <u>Zachry International v. Tribunal Superior</u>, 104 DPR 267, 277 n.9 (1975) (Énfasis suplido). Una clasificación sospechosa puede basarse en una cualidad o rasgo congénito o inmutable de las personas, pero no tiene que poseer necesariamente esas características. Véase <u>De Paz Lisk v. Aponte Roque</u>, 124 DPR 472 (1989) (reconociendo que, aunque la clasificación en controversia no revelaba a

primera vista rasgos congénitos o inmutables, constituía una clasificación sospechosa). En relación con lo anterior, resulta patentemente relevante el comentario de la Comisión de la Carta de Derechos de la Convención Constituyente en torno a la Sec. 1 del Art. II de nuestra Constitución:

> [l]a igualdad ante la ley queda por encima de **accidentes o diferencias**, bien tengan su origen en la **naturaleza o en la cultura**. Todo discrimen o privilegio contrario a esta esencial igualdad **repugna el sistema jurídico puertorriqueño**. En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que **obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto**. (Énfasis suplido). Diario de Sesiones, pág. 2561.

Como se puede colegir de esa cita, el discrimen que prohíbe nuestra Constitución se extiende no solo a las características o diferencias que tienen su origen en la naturaleza y que son congénitas o consustanciales a la persona sino también a las diferencias que se originan en la cultura. En otras palabras, la protección constitucional contra el discrimen abarca aquel con base en las diferencias entre personas o grupos que **la sociedad crea a raíz de sus creencias y valores** y que son arbitrarias e irrazonables. Por lo tanto, un elemento importante de toda clasificación sospechosa es que "tiende a relegar a un **estado legal de inferioridad** a una clase

**con abstracción de las potencialidades y características individuales de sus miembros".** Zachry International v. Tribunal Superior, supra, pág. 282 (Énfasis suplido). Es decir, responden "a un **propósito de hostilidad contra determinado grupo".** De Paz Lisk v. Aponte Roque, supra, pág. 488 (Énfasis suplido).

Al examinar las categorías que se incluyeron en la Constitución de Puerto Rico, podemos comprobar que todas comparten las características aludidas. Ello responde a que estas reflejan las características determinantes de las clasificaciones o categorías que ofenden la Constitución por ser contrarias a los principios de dignidad e igualdad humana. Así, el que una categoría o clasificación comparta esas características o afecte un derecho fundamental debe ser suficiente para que aplique la garantía constitucional contra el discrimen. Procede descartar cualquier otra consideración que tienda a limitar el alcance de ese derecho constitucional así como cualquiera otra que enerve los principios de igualdad y dignidad humana.

Conscientes de estos principios rectores, definamos el contenido y alcance del discrimen por condición social a tenor de las garantías mínimas constitucionales que consagra nuestro ordenamiento.

III.

El significado del discrimen por condición social es algo enigmático, pues tal categoría o clasificación no se encontraba en el texto original que la Comisión de la Carta de Derechos propuso a la Convención Constituyente. La versión original de la Sec. 1 del Art. II de la Constitución de Puerto Rico prohibía el discrimen por "raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas". Diario de Sesiones, supra, pág. 2561. Sin embargo, durante el debate del proyecto constitucional, el delegado Sr. Padrón Rivera propuso que la sección se enmendara para incluir las palabras "o condición" después de origen, de modo que la disposición constitucional leyera "origen o condición social". Diario de Sesiones, supra, pág. 1381 (1961). La enmienda se aprobó sin mediar debate o comentarios entre los delegados. Íd. Sin embargo, posteriormente el delegado Fernández solicitó que se le aclarara la forma en que el derecho a no ser discriminado por origen o condición social se podía hacer valer. Ante esta interrogante el delegado Benítez señaló, en lo pertinente:

> En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo. Y **todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento**. En lo que toca a qué es lo que se quiere decir con origen social,

> quiérese decir con origen social, que no importa **la extracción de la persona, su situación económica, su condición en la comunidad**, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal. Diario de Sesiones, supra, pág. 1382 (1961).

La explicación que brindó el delegado Benítez complementa los comentarios de la Comisión de la Carta de Derechos en torno a qué constituye origen social. Al respecto la Comisión expuso que "[e]sta expresión reafirma el principio de descartar toda gradación, favoritismo **o prejuicio** al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., **por motivos de origen o condición social**". Diario de Sesiones, supra, pág. 2562 (Énfasis suplido).

Salvo estas expresiones breves, el Diario de Sesiones de la Convención Constituyente no contiene debates o comentarios sobre el significado del discrimen por condición social. No obstante, el examen del debate existente y la aplicación de los principios generales que expusimos sobre la interpretación liberal de los derechos individuales, obliga a concluir que la cláusula antidiscrimen persigue dar plenitud a las garantías de dignidad e igualdad humana.

Primeramente destacamos que, al insertar las palabras "o condición" para crear la categoría de condición social, los constituyentes expandieron considerablemente el alcance de la cláusula antidiscrimen. Esto se debe a que, de todas las modalidades de discrimen que nuestra Constitución prohíbe, esta es la más amplia, dinámica y abarcadora. El término *condición* en sí, por su amplitud, permite insertar múltiples categorías bajo esta modalidad; esto, a diferencia del concepto *origen*, el cual tiene un significado más limitado. En segundo lugar, la discusión sobre el concepto de *condición social* permite deducir que se adoptó para brindar protección en múltiples contextos y situaciones, pues se describió en términos generales, sin aludir a las subcategorías particulares que podrían estar subsumidas en él. Por consiguiente, le corresponde a este Alto Foro, como máxime interprete de la Constitución, precisar sus contornos y contenido. Finalmente, del historial de la disposición en controversia se desprende que, aunque amplio, su alcance no es ilimitado. Conforme explicó el delegado Fuster, la prohibición del discrimen por condición social protege a las personas de tratos diferenciales injustificados cuando estos están basados en su situación económica <u>o</u> en su condición en la comunidad. Se infiere, pues, que el discrimen

por condición social responde a factores sociales o económicos. De manera más particular, de las expresiones del delegado Fuster se puede colegir que la garantía contra el discrimen por condición social protege a las personas que son discriminadas por su estatus económico y/o por su estatus social. J. R. Roqué Velázquez, *Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico*, 39 Rev. Jur. UIPR 183, 189 (1992) ("Existen dos vertientes del discrimen por origen o condición social; la primera, en que no se puede discriminar por origen o procedencia social o económica del individuo, y la segunda, por condición o estatus social o económica del individuo") (Comillas internas omitidas). En este contexto, estatus social se refiere a una situación especial en la que se encuentra una persona o grupo en relación con las demás personas que componen la sociedad. Esta interpretación es consistente con el principio que exige que los derechos individuales se interpreten liberalmente, pues los conceptos estatus económico y estatus social son suficientemente amplios como para garantizar la protección de los principios de igualdad y dignidad humana.

Ahora bien, esta conclusión no culmina nuestro análisis. Ante la amplitud que necesariamente conlleva el discrimen por condición social —aun si

lo concebimos y definimos en términos de estatus social o económico— procede establecer una metodología y ciertos parámetros para determinar la aplicabilidad del discrimen por condición social a hechos y circunstancias particulares. A esos fines, el profesor José R. Roqué Velázquez propone que se utilice como esquema de análisis la teoría o principio de la antisubyugación. Íd., pág. 197. Según explica, "[e]ste se dirige a romper con los sistemas de subordinación […] que tratan a algunas personas como ciudadanos de segunda clase" y su valor medular "es que todas las personas son iguales o tienen igual valor". Íd. Bajo este esquema, existirá protección contra el discrimen en la modalidad de origen o condición social si se satisfacen tres requisitos: (1) "la sociedad en general le atribuye una clasificación o connotación negativa, ya sea por mitos, ignorancia o **prejuicios**, a los miembros de ese grupo, clase o individuos"; (2) "a ese grupo, clase o individuos, **se le ha sometido históricamente a un grado convincente de opresión en la sociedad**", y (3) "debe demostrarse evidencia del perjuicio o agravio". Íd., págs. 197-198 (Énfasis suplido). Para satisfacer el tercer requisito, la persona que alegue ser víctima de discrimen debe aportar evidencia de un perjuicio o agravio actual, la cual puede ser "en términos de **negación de empleo a la persona**, negación

de servicios públicos o beneficios, privilegios injustos que se le ofrezcan a otras personas igualmente situadas, etc.". Íd., pág. 198 (Énfasis suplido).

Como se puede apreciar, los parámetros que establece el modelo de antisubyugación son enteramente compatibles con nuestros pronunciamientos sobre las características de las clasificaciones sospechosas y el tipo de discrimen que está vedado por nuestra Constitución. Según se expuso, el trato desigual que condena la Constitución de Puerto Rico es aquel que se basa en diferencias cuyo origen es la naturaleza o la cultura y que es arbitrario, injustificado, irrazonable u odioso. Además, se considera particularmente repugnante aquel que se basa en una clasificación que **no guarda relación con la habilidad o aptitud de las personas** que la componen y que relega a un **estado de inferioridad** a una clase **sin considerar las potencialidades y características individuales de sus miembros**. Estas clasificaciones, en lugar de ser objetivas, **responden a la hostilidad** contra un grupo determinado. El modelo propuesto permite identificar discrímenes basados en esas consideraciones en el contexto del discrimen por condición social, ya que se enfoca en identificar grupos o individuos a los que se les ha atribuido una connotación negativa en

la sociedad y, a causa de ello, se les ha relegado a un estado de inferioridad. También se enfoca en identificar tratos desiguales subjetivos que son producto de la hostilidad hacia un grupo determinado y que tienen su origen en la cultura al fundamentarse en prejuicios y mitos sociales. Por consiguiente, su adopción resulta apropiada y aconsejable. Su aplicación produciría, indudablemente, resultados consistentes con los postulados de igualdad y dignidad humana que sirven de base a la prohibición del discrimen en nuestro ordenamiento.

IV.

Tras definir qué constituye el discrimen por condición social y establecer la metodología para determinar cómo aplica caso a caso, procede determinar si las personas con convicciones criminales previas tienen derecho a que se les proteja constitucional y estatutariamente bajo esta modalidad de discrimen. Las personas con antecedentes penales o convicciones previas satisfacen fácilmente cada uno de los requisitos para ser acreedores de la protección.

En primer lugar, a las personas que delinquen se les atribuye una connotación negativa en la sociedad —es decir, se les condiciona socialmente— ya que se les cataloga como criminales y delincuentes, de lo cual no se liberan incluso después de cumplir la pena

que se les impuso. Por otro lado y con relación a lo anterior, a los exconfinados "se les enfoca socialmente en lo más bajo de la jerarquía o estratificación, ya sea social o económica". Roqué Velázquez, supra, pág. 198.

En segundo lugar, "los exconfinados […] demuestran que en su historia grupal o individual han sido sometidos a un grado convincente de opresión social". Íd. Debido al estigma del que son objeto, a las personas con antecedentes penales se les dificulta conseguir empleo y, de esa forma, ven coartadas y limitadas sus oportunidades de reintegrase efectivamente en la sociedad. Además, por el trato diferencial que reciben "[s]u oportunidad de movilidad social, política y económic[a] es irreal. Se convierten en una clase sin poder y sin modos de influir en el poder a favor de sus semejantes. Todo ello a pesar de que se cumpliera con la sanción penal impuesta". Íd. En tercer y último lugar, el perjuicio y agravio actuales se establecen, precisamente, por la negación de empleo y oportunidades a la que se enfrentan los exconvictos por el solo hecho de poseer antecedentes penales. Esa es, a fin de cuentas, la alegación principal en este caso.

En consideración a lo anterior, se debe concluir que las personas con convicciones criminales

satisfacen los requisitos para que se les aplique la garantía contra el discrimen por condición social. Debido a los prejuicios y estigmas culturales y sociales con que se les asocia, a estas personas se les impone o asigna un estatus social inferior al del resto. Esto las hace acreedoras de protección. No hay duda de que el trato desigual basado en estereotipos, prejuicios y estigmas tiene su origen en la cultura o en la sociedad y, como tal, es ajeno a consideraciones objetivas y razonables que justifiquen su existencia. En otras palabras, los prejuicios y estigmas se contraponen a, y anulan, la objetividad y razonabilidad de la clasificación.

La interpretación del texto de nuestra Constitución conduce a la conclusión inequívoca de que el discrimen contra las personas que poseen antecedentes penales está subsumido en la categoría de discrimen por condición social. No obstante, la Mayoría avala un resultado distinto. Esto, al insertar en el análisis interpretativo del discrimen por condición social unas consideraciones que no son determinantes al evaluar si una clasificación o trato desigual ofende la Constitución. Particularmente, la Mayoría concentra su análisis en que las personas convictas criminalmente adquieren esa cualidad como consecuencia de un acto voluntario y concluye que, por lo tanto, estas no tienen derecho a la protección

contra el discrimen por condición social, ya sea constitucional o estatutariamente. No comulgo con esa conclusión.

Por una parte, al enfrentarnos a controversias donde la validez de una clasificación está en entredicho o donde se alegue que una clasificación es sospechosa, no debemos enfocar el análisis en la voluntariedad o espontaneidad con que se ha adquirido la cualidad o característica a base de la cual se discrimina. Aunque varios rasgos protegidos mediante las categorías que establece la Constitución se adquieren de manera fortuita o involuntaria, ello no es un elemento o requisito medular o indispensable para que una clasificación o trato desigual tenga protección constitucional. El enfoque debe ser evaluar si la clasificación o distinción que se hace es objetiva y razonable o si, por el contrario, ofende los principios de dignidad e igualdad humana por establecerse con abstracción de las habilidades y aptitudes de las personas que son objeto del trato desigual o con un propósito de hostilidad hacia un grupo determinado. Ese debe ser el factor rector y medular, pues solo de esa manera damos eficacia y plenitud a los principios de dignidad e igualdad humana en los cuales se fundamenta la prohibición del discrimen. No se debe adoptar una visión que limite el alcance de los derechos individuales y que no

tenga como eje garantizar el respeto de la esencial igualdad de todo ser humano, así como la inviolabilidad de su dignidad. Restringir el alcance de la protección contra el discrimen por condición social basándose en que la característica o cualidad que condiciona a una persona en la sociedad se adquirió como consecuencia de un "acto voluntario" conlleva ignorar el postulado básico de que la dignidad del ser humano es inviolable. Máxime cuando la clasificación en casos como el que nos ocupa es odiosa, no tiene una base objetiva y peor aún, tiene un origen histórico en condiciones que perpetúan la marginación y la pobreza de un sector de la población. Asumir el criterio mayoritario implicaría validar que las personas con antecedentes penales son merecedoras del trato desigual que reciben, ya que este es producto "de sus malas decisiones" y además que no tienen derecho a rehabilitarse, a pesar de que existe un mandato constitucional que exige al Estado fomentar la rehabilitación moral y social de los convictos de delito. Art. VI, Sec. 19, Const. ELA, supra.

Esa percepción choca directamente con la concepción de la inviolabilidad de la dignidad humana. Una convicción penal no reduce la dignidad de la persona convicta ni justifica que se discrimine en su contra por razón del estigma asociado a la

convicción. En resumen, limitar el contenido y significado del discrimen por condición social a base de las consideraciones que la Mayoría propone "es forzar una distinción contraria a su verdadero espíritu y propósito. Tal interpretación dejaría huérfanos de protección, precisamente, a los más desvalidos". Báez Cancel v. Alcalde Mun. de Guaynabo, 100 DPR 982, 987-988 (1972).

Por otra parte, considero que la Mayoría ignora que la condición que una persona tiene en la sociedad no es, necesariamente, consecuencia directa de sus actos. Por el contario, muchas veces responde a creencias y valores sociales y culturales que determinan la posición de las personas en la estratificación social. En el caso de las personas con convicciones criminales, lo que las condiciona en la sociedad no es el hecho en sí de poseer una convicción, sino el estigma y prejuicio cultural y social que se les atribuye a las personas que comparten esa característica. Sin el estigma que está atado a la convicción penal esta cualidad no condicionaría a las personas socialmente y no se consideraría una clasificación basada en la condición social de la persona.

Más aun, no podemos ignorar que múltiples estudios indican que existe una relación directa entre la clase socioeconómica a la que se pertenece

y la probabilidad de ir a la cárcel cuando se es imputado de un crimen. Es decir, se ha demostrado que los pobres, las personas negras y otras minorías entran en contacto con el sistema de justicia criminal con una frecuencia desproporcionadamente alta, precisamente por no contar con los recursos económicos y/o por el color de su piel. No se trata de algo opcional, sino que su entorno social los encierra en un círculo vicioso del cual es sumamente difícil salir. Anthony V. Alfieri, Black, Poor, and Gone: Civil Rights Law's Inner-City Crisis, 54 Harv. C.R.-C.L. L. Rev. 629, 634 (2019); *Why Inequality Matters for Criminology and Criminal Justice,* Paul's Justice Blog (Aug 2, 2014); Paul D. Butler, Poor People Lose: Gideon and the Critique of Rights, 122 Yale L.J. 2176-2204 (2013).

Por todo lo anterior, reafirmo que procede concluir que el discrimen por convicciones previas está subsumido en la categoría de discrimen por condición social. Esta conclusión no solo es cónsona con los principios de dignidad e igualdad humana y el canon de interpretación constitucional que exige una interpretación liberal de los derechos constitucionales individuales, sino que también concuerda con la política pública de la Ley Núm. 100, supra, que "**es cónsona con nuestra aspiración social de crear un sistema jurídico que fomente**

la igualdad de los individuos". Ramos Pérez v. Univisión, 178 DPR 200, 222 (2010) (Énfasis suplido). Es por eso que hemos establecido que, al definir el alcance de la Ley Núm. 100, supra, se debe tomar en consideración su objetivo de proteger a la masa trabajadora contra el discrimen en el empleo **e interpretar sus disposiciones siempre de la manera más favorable al empleado o solicitante.** Díaz v. Wyndham Hotel Corp., supra, págs. 381-382 (Énfasis suplido). Interpretar que el discrimen por convicciones previas es una modalidad de discrimen por condición social es consistente con estos principios.

Por consiguiente, contrario a lo que la Mayoría resuelve, la Ley Núm. 100, supra, prohíbe a todo patrono rehusar o dejar de emplear a un solicitante o despedir, suspender o discriminar contra un empleado con relación a su sueldo y condiciones de trabajo **únicamente por el hecho de que el solicitante o empleado fue convicto criminalmente.** Conforme al esquema de esa legislación, el solicitante o empleado que sufre este tipo de discrimen está legitimado para presentar una acción sobre daños y perjuicios contra el patrono discriminante. 26 LPRA sec. 146.

Ahora bien, es necesario reconocer que el derecho de una persona a no ser discriminada por sus convicciones previas en ocasiones colisiona con

derechos fundamentales del patrono o de terceras personas o con intereses del Estado. A modo de ejemplo, el derecho a la no discriminación podría contraponerse a derechos e intereses como: "la seguridad pública; el bienestar de la niñez y de otras poblaciones igualmente vulnerables; la erradicación y prevención del crimen, y la protección de los intereses propietarios y libertarios de nuestros ciudadanos". Rosario Díaz v. Toyota de Puerto Rico, 166 DPR 1, 27 (2005). Estos valores podrían ser, en determinadas circunstancias, de igual o incluso mayor envergadura y jerarquía que el derecho a la no discriminación. Ante tal situación, es necesario "realizar un *adecuado balance* entre tal protección a los empleados y el valor e interés patronal […]". Díaz v. Wyndham Hotel Corp., supra, pág. 382 (Énfasis en el original). En su Opinión de conformidad en Rosario Díaz v. Toyota de Puerto Rico, supra —donde este Foro abordó la misma controversia que hoy enfrentamos sin lograr alcanzar una solución que sentara un precedente— el Juez Asociado Rebollo López sugirió que, para atender el choque de derechos y establecer un balance adecuado entre ellos, se estableciera una serie de factores que el patrono podía considerar al momento de determinar si concedía o denegaba un trabajo a una persona con convicciones previas. Estos factores son:

(1) la naturaleza y gravedad del delito […]; (2) la relación entre el delito […], el empleo […], y los requisitos y responsabilidades que el trabajo conlleva; (3) el grado de rehabilitación del solicitante y cualquier información que el solicitante o un tercero pueda legítimamente brindar al respecto; (4) las circunstancias bajo las cuales se cometió el delito…; (5) la edad del solicitante al cometer el delito; (6) el tiempo transcurrido entre la convicción y la solicitud de empleo, y (7) el interés legítimo del patrono en proteger la propiedad, la seguridad y el bienestar propios, de terceros o del público en general. Íd., pág. 28.

El Juez Asociado Rebollo López señaló que el patrono solo podría discriminar legítimamente contra la persona exconvicta si, al sopesar todos los factores, le era razonable concluir que la convicción previa del solicitante lo descalificaba para ocupar el puesto. Íd. Finalmente, sugirió que este análisis de factores se insertara al esquema probatorio particular de la Ley Núm. 100, supra, como una vía que el patrono demandado tendría disponible para *derrotar* la presunción de discrimen que esa ley establece. Íd. Particularmente, el patrono demandado podrá "aceptar que discriminó contra el solicitante, pero que su acto se justifica, *cuando se toma en consideración el riesgo excesivo a los que razonablemente se exponen los intereses del patrono o de la comunidad con la posible contratación del ex convicto, una vez sopesados todos los elementos*".

Íd., págs. 28-29 (Énfasis en el original). Este tipo de modelo pudiera lograr un balance adecuado entre los derechos e intereses envueltos pues permitiría distinguir entre aquellas situaciones en que el discrimen se basa únicamente en la existencia de la convicción y aquellas que tienen una justificación legítima por razón de que la convicción está directa e íntimamente relacionada con el puesto que la persona exconvicta ocupa o desea ocupar o cuando existen derechos o intereses de igual o mayor envergadura que justifican que ceda el derecho a la no discriminación.

V.

En fin, hoy procedía pautar que, salvo en las circunstancias en que exista un interés legítimo del patrono para denegar un empleo o despedir a una persona por razón de tener una convicción previa, el discrimen por la condición de ser exconvicto es una modalidad de discrimen por condición social que está proscrito tanto por nuestra Constitución como por la Ley Núm. 100, supra. Como resultado de los prejuicios que imperan en nuestra sociedad, la mera posesión de una convicción criminal irrefutablemente coloca a la persona exconvicta en un estatus social distinto e inferior al de otras personas. La cualidad de ser exconvicto es objeto de connotaciones sociales negativas, pues conlleva el estigma y la marginación

de las personas que comparten esa característica. Además, históricamente se ha condicionado a las personas con antecedentes penales a la opresión social al negarle iguales oportunidades en la sociedad, lo cual les causa un grave perjuicio. Por otro lado, es innegable que el discrimen contra una persona por el único hecho de haber sido convicta de delito atenta contra su dignidad, ya que disminuye su valor intrínseco como ser humano al estimársele inelegible para desempeñar una labor o participar plenamente en la sociedad, no por sus aptitudes y habilidades individuales, sino únicamente por el estigma social y cultural con que se asocia al grupo de personas que tienen la condición de exconvictos. El estigma y la marginación contra las personas convictas de delito indudablemente "trata de un mal enraizado en nuestro comportamiento colectivo que es contrario a los valores fundamentales de nuestro ordenamiento jurídico, de que la dignidad del ser humano es inviolable, y de que todas las personas son iguales ante la ley". Aponte Burgos v. Aponte Silva, 154 DPR 117, 134 (2001). "Es tiempo ya que este Tribunal le d[é] plena vigencia a las proscripciones que emanan de nuestra propia Constitución […]. Sólo así podemos extirpar de raíz ese grave vicio de nuestra cultura […]". Íd.

Reconocer que el discrimen por condición social incluye el discrimen por convicciones previas era el paso obligado en esa dirección. No reconocerlo es añadir al estigma y continuar condenando a este sector de la población a la pobreza y a la marginación. Debido a que la Mayoría optó por ese curso, disiento enérgicamente.


                              Maite D. Oronoz Rodríguez
                                  Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Garib Bazain, Jorge<br><br>Recurrido<br><br>v.<br><br>Hospital Español Auxilio Mutuo de Puerto Rico, Inc.; Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico, Inc.; Dr. José A. Isado Zardón y la Sociedad de Bienes Gananciales compuesta con la Sra. Diana Vigil Vigil<br><br>Peticionarios | CC-2018-0530 | Certiorari |

El ex-confinado en Puerto Rico lucha hoy contra la corriente para ubicarse en una posición digna. No le es fácil conseguir trabajo asalariado. Tampoco tiene el crédito necesario para montar su propio taller o negocio. Ha perdido años preciosos de su vida sin recibir adiestramiento u optar por una educación superior que lo habilite para el mundo del trabajo y la vida contemporánea. La mentalidad popular le achaca vicios, enfermedades y propensiones que generalmente se vinculan con la reclusión penitenciaria. Las voces que se levantan a su favor son ahogadas por los prejuicios. F. Picó, El día menos pensado: Historia de los presidiarios en Puerto Rico, San Juan, Ed. Huracán, Inc., 1994, págs. 172-173.

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ.

San Juan, Puerto Rico, a 27 de julio 2020.

Los principios constitucionales de la igualdad y la dignidad humana exigen que protejamos los derechos fundamentales de **todas** las personas, independientemente de

su procedencia, nacionalidad, sexo, raza, género, religión y condición social. Tal encomienda cobra aún más importancia cuando nos enfrentamos a discrímenes rampantes e injustificados en contra de personas marginadas, oprimidas y vulnerables. Las personas exconvictas no son excepción. Todo lo contrario, son uno de los grupos sociales que más sufren los embates de la desigualdad. Por tanto, en esas situaciones resulta imperativo equiparar diferencias.

En esa misma línea, recientemente la Corte Suprema de los Estados Unidos ejerció adecuadamente su rol como garante de los derechos individuales, precisamente, en el ámbito del discrimen laboral. Véase Bostock v. Clayton County, 509 U.S. __ (2020). Similarmente, resulta igualmente inescapable reconocer que cuando un patrono discrimina contra una persona ex convicta, lo hace por razón de la condición en que está inmersa en nuestra sociedad.

En ese sentido, hoy correspondía pautar que la denegación de un empleo fundamentado en la convicción previa de un o una aspirante está proscrito por la prohibición de discriminación por origen o condición social. Debido a que una Mayoría resolvió lo contrario al negar a las personas exconvictas el reconocimiento de esa protección de rango constitucional y el disfrute pleno de su ciudadanía, disiento enérgicamente del dictamen mayoritario.

Debido a que el trasfondo de la controversia de epígrafe está adecuadamente reseñado en la Opinión mayoritaria, procedemos a exponer los fundamentos del disenso.

**I.**

**A.**

La Carta de Derechos de la Constitución de Puerto Rico establece en su Sec. 1 los principios fundamentales que deben permear obligatoriamente todos los aspectos de nuestro ordenamiento jurídico. A esos fines, dispone lo siguiente:

> La **dignidad** del ser humano es inviolable. Todos los hombres son **iguales** ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos **principios de esencial igualdad humana**. (Énfasis suplido). Art. II, Sec. 1, Const. PR, LPRA, Tomo 1.

A la luz de estos derechos de la más suprema jerarquía, se prohíbe expresamente la discriminación en el disfrute de los derechos fundamentales. De esta manera, "[e]stos preceptos constitucionales demuestran el compromiso claro de los constituyentes en prohibir los discrímenes y la desigualdad en nuestro país". J. R. Roqué Velázquez, <u>Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico</u>, 26 Rev. Jur. UIPR 519, 519 (1992).

Asimismo, de lo anterior se desprende que la dignidad y la igualdad de las personas son valores jurídicos supremos que deben guiar toda interpretación constitucional. Por tanto, para precisar adecuadamente las categorías que están

cobijadas por la Sec. 1 de la Carta de Derechos, debemos abundar en los contornos de los derechos a la dignidad y a la igualdad.

Como es conocido, la Constitución de Puerto Rico se nutrió extensamente del discurso internacional que reaccionaba a las atrocidades ocurridas en la Segunda Guerra Mundial. E. Vicente Rivera, _Una mirada a la interpretación de los derechos económicos, sociales y culturales en las decisiones del Tribunal Supremo de Puerto Rico_, 44 Rev. Jur. UIPR 17, 20 (2009). Así, nuestro ordenamiento constitucional se benefició de documentos importantes como la Declaración Universal de Derechos Humanos y la Declaración Americana de los Derechos y Deberes del Hombres, los cuales tenían como propósito materializar el respeto por los derechos humanos, la dignidad, la igualdad y la libertad. Íd. En virtud de lo anterior, nuestra Ley Suprema enmarcó los derechos a la dignidad y a la igualdad en términos mucho más amplios y abarcadores que en la Constitución de los Estados Unidos.

Al así hacerlo, la dignidad humana conceptualizada en nuestra Carta de Derechos se fundamenta en el entendimiento universal de que todas las personas tienen un valor intrínseco, el cual "existe en idéntica magnitud en cada uno de ellos". C. E. Ramos González, _La inviolabilidad de la dignidad humana: Lo indigno de la búsqueda de expectativas razonables de intimidad en el Derecho Constitucional Puertorriqueño_, 45 Rev. Jur. UIPR 185, 186 (2010). En ese

sentido, "[t]he most diverse authorities on the subject have recognized that human dignity is generally associated with the notion of **respect for the intrinsic worth of every person** or, in a word, 'personhood'". (Énfasis en el original). H. A. Meléndez-Juarbe, Privacy in Puerto Rico and the Madman's Plight: Decisions, 9 Geo. J. Gender & L. 1, 45 (2008). A raíz de ese valor humano, se entiende que todas las personas tienen autonomía y libertad para tomar decisiones en torno a su propia vida.

Como corolario de lo anterior, la inviolabilidad de la dignidad humana exige necesariamente que todos los componentes de la sociedad actúen con respeto y en solidaridad entre sí. Entiéndase, la dignidad humana opera ex propio vigore tanto entre las personas como frente al Estado. Alberio Quiñones v. E.L.A., 90 DPR 812, 816 (1964); Figueroa Ferrer v. E.L.A., 107 DPR 250, 259-260 (1978). Es por ello que la dignidad se considera "el imperativo fundamental contra la discriminación". Ramos González, supra. Así lo explicó el delegado Jaime Benítez Rexach de la Convención Constituyente al abundar en el propósito de la Carta de Derechos:

> Quiero ahora, brevemente, señalar la arquitectura ideológica dentro de la cual se monta esta proposición. Tal vez toda ella está resumida en la primera oración de su primer postulado: la dignidad del ser humano es inviolable. **Esta es la piedra angular y básica de la democracia.** En ella radica su profunda fuerza y vitalidad moral. Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica

precisamente **en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esa dignidad merita y la responsabilidad en consecuencia que tiene todo el orden constitucional de descansar en ella, protegerla y defenderla.** (Énfasis suplido). 2 Diario de Sesiones de la Convención Constituyente 1342 (versión digital).

Como puede apreciarse, la dignidad humana contemplada en nuestra Carta de Derechos tiene unas repercusiones innegables en el ordenamiento puertorriqueño. Distinto al ordenamiento federal, la dignidad humana es el norte y el principio rector que debe guiar toda interpretación constitucional local. Como bien explicó el profesor Carlos E. Ramos González:

> Su diferencia textual con la Constitución de Estados Unidos es diáfana: no existe en dicho texto constitucional referencia a la dignidad humana. Mas allá del texto, una verdad histórica me parece evidente: la Carta de Derechos ("Bill of Rights") de 1791 de la Constitución de los Estados Unidos refleja el pensamiento liberal e individualista que sólo buscaba limitar los poderes del Estado o gobierno frente al individuo. **El propósito principal de la Carta de Derechos de la Constitución de Puerto Rico es diferente; su norte es vindicar la dignidad humana, y como parte de este objetivo, persigue limitar los poderes del gobierno, e imponerle obligaciones a ese Estado. Aún más: les impone límites y obligaciones a personas naturales y jurídicas no gubernamentales. Estas diferencias no pueden ser inconsecuentes.** (Énfasis suplido). Ramos González, <u>supra</u>, pág. 188.

Por su parte, la premisa de que todas las personas somos iguales ante la ley está íntimamente relacionada con la dignidad humana. El reconocimiento constitucional de la igualdad se instrumentó expresamente en las Secs. 1 y 7 de

la Carta de Derechos, plasmando así la vocación puertorriqueña de "perpetuar en nuestro ordenamiento jurídico el trato igualitario de los seres humanos ante la ley". E. J. Rivera Juanatey, <u>Discrimen por antecedentes penales: Hacia una reconsideración del discrimen por condición social</u>, 41 Rev. Jur. UIPR 585, 593 (2007). Así, "[l]a igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución". <u>P.R.P. v. E.L.A.</u>, 115 DPR 631, 633 (1984).

El pilar de la igualdad no se reduce a términos estrictos y uniformes. Según hemos expresado anteriormente, "la igualdad entendida mecánicamente, más aplicada de modo uniforme, desemboca en desigualdades reales". L. F. Estrella Martínez, <u>Acceso a la justicia: Derecho humano fundamental</u>, San Juan, Ed. Situm, 2017, pág. 33. Es por ello que la igualdad real exige el reconocimiento de las diferencias, las circunstancias y las particularidades inminentes de los distintos sectores para así aspirar a una aplicación del Derecho equitativa. Véase, E. Rivera Ramos, <u>La igualdad: Una visión plural</u>, 69 Rev. Jur. UPR 1 (2000).

En fin, "el norte principal de nuestra Carta de Derechos, a diferencia de la Constitución de los Estados Unidos, es la inviolabilidad de la dignidad humana entendida con todos sus componentes de igualdad, libertad y solidaridad". Ramos González, <u>supra</u>, pág. 189. Es por ello que "la dignidad e igualdad del ser humano y la fidelidad a

sus valores van por encima de posiciones sociales, diferencias raciales e intereses económicos". <u>Ocasio v. Díaz</u>, 88 DPR 676, 727 (1963).[11]

A la luz de estos pilares fundamentales, la Carta de Derechos prohíbe expresamente que se discrimine en contra de persona alguna por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o ideas religiosas. Art. II, Sec. 1, Const. PR, LPRA, Tomo 1. Estas categorías **no** son taxativas. Al contrario, la Sec. 19 de la Carta de Derechos provee que "[l]a enumeración de derechos que antecede **no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente**". (Énfasis suplido). Íd., Sec. 19. La Comisión de la Carta de Derechos explicó en su informe que el propósito de esta disposición constitucional es el siguiente:

> [P]roteger los derechos del individuo contra una interpretación restrictiva o contra una interpretación basada en la conocida norma de <u>inclusio unius</u>, <u>exclusio alterius</u>. Según este último principio interpretativo, el acto de enumerar conlleva el acto de excluir, de suerte que todo lo que no se menciona queda por ese solo hecho descartado. **No creemos que en una constitución deba incorporarse un principio de**

---

**esta inflexibilidad. . . Una interpretación en el sentido de que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha recogido la Comisión al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables.** (Énfasis suplido). 4 Diario de Sesiones de la Convención Constituyente 3190 (versión digital).

Es por ello que la Sec. 1 de la Carta de Derechos es numerus apertus, por lo que pueden existir clasificaciones prohibidas que no están expresamente señaladas en la disposición constitucional. En ese sentido, distinto a la Constitución de los Estados Unidos que profesa un status negatis libertatis (Estado se abstenga de infringir los derechos de los ciudadanos), en la Constitución de Puerto Rico rige un status creditoris (se le exige al Estado una acción positiva en beneficio del individuo).

**B.**

La controversia ante nos exige que precisemos la naturaleza y el alcance de una de las categorías cobijadas bajo la Sec. 1 de la Carta de Derechos: la prohibición de discrimen por "origen o condición social". Ello, con el propósito de determinar si las personas exconvictas están cobijadas por tal disposición. Veamos el trasfondo de su aprobación y posterior interpretación.

Inicialmente, la Comisión de la Carta de Derechos propuso que parte de la precitada Sec. 1 de la Carta de Derechos leyera del siguiente modo: "[n]o podrá establecerse

discrimen alguno por motivo de raza, color, sexo, nacimiento, **origen social**, ideas políticas o religiosas".[12] (Énfasis suplido). 4 Diario de Sesiones de la Convención Constituyente 3175 (versión digital). Nótese que la Comisión no contempló la inclusión expresa de la palabra "condición" social. Sin embargo, su informe evidencia la intención innegable de prohibir la discriminación basada tanto en **la naturaleza o el origen** de una persona, como en **la cultura o la condición** de una persona. Así se desprende del objetivo que la Comisión vislumbró para la Sec. 1:

> El propósito de esta sección es fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. **La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura**. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto. (Énfasis suplido). Íd.

De hecho, la Comisión igualmente consignó que el concepto de origen social "reafirma el principio de descartar toda

---

[12]En aras de proveer recomendaciones sobre el contenido de la Carta de Derechos de la Constitución de Puerto Rico, se creó la conocida Comisión de la Carta de Derechos. En esa encomienda, sus miembros prepararon y aprobaron un informe con una serie de propuestas importantes, las cuales influenciaron directamente la Carta de Derechos aprobada finalmente por la Convención Constituyente. 4 Diario de Sesiones de la Convención Constituyente 3174 (versión digital).

gradación, favoritismo o prejuicio al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivos de **origen o condición social**". (Énfasis suplido). Íd., pág. 3176.

En virtud de lo anterior, al adoptar el lenguaje propuesto por la Comisión, la Convención Constituyente incorporó una enmienda importante. A esos efectos, el delegado Lino Padrón Rivera sugirió que, después de la palabra "origen", se intercalara la palabra "condición". 2 Diario de Sesiones de la Convención Constituyente 1673 (versión digital). La Convención Constituyente aprobó la enmienda propuesta y, de este modo, quedó plasmado un lenguaje aún más comprensivo y abarcador, en el cual se proscribió el discrimen por "origen o condición social". Íd., pág. 1674.

Una vez acogida la enmienda, el delegado Lionel Fernández Méndez levantó una preocupación en torno a cómo se podía garantizar la protección en contra de un discrimen por origen o condición social. Ante tal interrogante, el delegado Jaime Benítez Rexach explicó lo siguiente:

> En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo. Y todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento. En lo que toca a qué es lo que se quiere decir con origen social, quiérese decir con origen social, que **no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras**

**leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal.** (Énfasis suplido). 2 Diario de Sesiones de la Convención Constituyente 1675 (versión digital).

De lo anterior, se desprende nuevamente la intención de la Convención Constituyente de que la proscripción del discrimen por origen o condición social fuese más allá de la naturaleza o procedencia social. Incluye, a su vez, la condición o estatus de las personas en la sociedad puertorriqueña.

A la luz de este trasfondo, se puede observar que la prohibición constitucional de discriminar por origen o condición social se materializa en dos vertientes. Como propuso acertadamente el profesor José R. Roqué Velázquez, la primera vertiente cobija todo discrimen motivado por **el origen o la procedencia social** de una persona. Roqué Velázquez, supra, pág. 524. De este modo, se proscribe el discrimen "por el mero hecho de que una persona haya nacido en un lugar pobre o un lugar rico, o que su familia tuviese pocos recursos económicos o muchos recursos económicos, o que ésta posea poca o mucha educación, o por tener padres homosexuales o impedidos". Íd., pág. 525.

Un ejemplo de esta primera vertiente se reflejó en Vicéns v. U.P.R., 117 DPR 771 (1986), en el que este Tribunal se negó inicialmente a expedir un recurso donde se impugnaba la constitucionalidad del programa de admisión a la escuela elemental de la Universidad de Puerto Rico, la cual

favorecía automáticamente a los hijos e hijas de empleados de dicha institución. En esa ocasión, el Juez Asociado señor Negrón García emitió un Voto particular disidente en el cual arguyó que el favorecimiento de una persona a razón de su extracción social -en este caso, ser el hijo o hija de algún empleado universitario- violaba la prohibición de discriminación por origen o condición social. Íd., págs. 780-781 (Negrón García, Voto particular disidente). Posteriormente, este Tribunal reconsideró y emitió el interdicto preliminar solicitado mediante una Sentencia.

Por otro lado, la segunda vertiente de esta categoría prohíbe el discrimen por **la condición, la cultura o el estatus social** de una persona. Roqué Velázquez, supra, págs. 524-525. De este modo, esta modalidad vedaría cualquier discriminación de la siguiente naturaleza:

> [N]o se puede discriminar por la **situación actual** del individuo, por el hecho de que un individuo sea abogado, médico o carpintero, o por poseer una mansión en tal urbanización o una pequeña casa en un área marginada. **La posición ante el círculo social o el círculo económico que adquiera una persona no puede ser utilizada por el Estado como base para discriminar.** (Énfasis suplido). Íd., pág. 525.

Un ejemplo del discrimen basado en la condición o el estatus social de una persona se materializó en Berberena v. Echegoyen, 128 DPR 864 (1991), en el que se impugnó una legislación cuyo efecto redundaría en la concesión de unos privilegios particulares a maestros y maestras. Ante ello, el Juez Asociado señor Rebollo López definió acertadamente

en su Opinión disidente los contornos de la segunda vertiente del discrimen por origen o condición social. Así, explicó que "no podrá discriminarse -a favor o en contra de persona alguna- **por razón de su condición o 'status', en la comunidad;** como tampoco por ser pobre o de cuantiosa fortuna; ni por ser prominente o **por tener o carecer de, cierto grado de escolaridad**". (Énfasis en el original). Íd., págs. 918-919 (Rebollo, López, Opinión disidente).

Asimismo, en la discusión de la Convención Constituyente sobre esta categoría, el delegado José Trías Monge sugirió otra enmienda que es reveladora para la controversia ante nos. Así, éste propuso que se hiciera constar en la Sec. 1 de la Carta de Derechos una prohibición expresa a la discriminación por "posición económica". 2 Diario de Sesiones de la Convención Constituyente 1674 (versión digital). Tal sugerencia la realizó con el propósito de atemperar totalmente la Carta de Derechos a la Declaración Universal de los Derechos del Hombre antes mencionada. Íd., pág. 1678.

No obstante, posteriormente, el delegado Víctor Gutierrez Franqui levantó la preocupación de que esta prohibición se utilizara para privar a personas desventajadas económicamente de fondos y subsidios públicos. En ese sentido, expresó que "la frase puede poner en peligro programas tan importantes como [el] desarrollo de viviendas donde los fondos públicos se destinan a construir viviendas

baratas y los cánones de arrendamiento se fijan exclusivamente a base de la posición económica de las personas que van a ocupar esas casas viviendas". Íd., pág. 2800.

Ante ello, la Convención Constituyente acogió la recomendación presentada y eliminó el término de "posición económica". Íd., pág. 2804. Tal decisión se fundamentó, a su vez, en el hecho de que la Carta de Derechos y su prohibición de discriminar por origen o condición social, de por sí, bastaban para prohibir el discrimen motivado por razones económicas. Así lo hizo constar el delegado Héctor González Blanes, al indicar lo siguiente: "[n]os satisface la eliminación de 'posición económica', porque entiendo que ahí está incluida la dificultad que levanta el compañero Reyes Delgado al ponerse más adelante 'o condición social'". Íd., pág. 2802.

Sin embargo, lo anterior **no** significa que el único alcance que tiene la prohibición del discrimen de origen o condición social es en torno a motivaciones económicas. Todo lo contrario, el historial extensamente reseñado evidencia una intención clara de amparar una gama de discrímenes sociales. Es decir, "el discrimen por posición económica o por pobreza, es un aspecto o renglón de la vertiente de discrimen por condición social, más no es lo único que caería dentro de ese ámbito". Roqué Velázquez, supra, pág. 534. Como bien explicó el actual Secretario del Departamento de

Corrección y Rehabilitación, Hon. Eduardo J. Rivera Juanatey:

> Examinado el historial de la Convención Constituyente, **se debe concluir que el concepto 'origen o condición social' va más allá de la protección contra el discrimen por la posición económica de las personas**, pues "[e]l día en que los derechos constitucionales de nuestros conciudadanos estén a expensas de consideraciones de naturaleza económica, será el día en que la justicia habrá dejado de constituir la razón de ser de nuestro ordenamiento". (Énfasis suplido). Rivera Juanatey, <u>supra</u>, págs. 604-605 (citando a <u>Pueblo v. Robles González</u>, 125 DPR 750, 765 (1990)).

Ahora bien, para que la protección de la cláusula del origen o condición social tenga la fuerza vinculante que la Convención Constituyente vislumbró, es importante que este Tribunal abunde sobre su alcance, sus contornos y sus implicaciones. Desafortunadamente, ese no ha sido el caso, pues esta categoría no ha sido objeto de la interpretación y análisis judicial que amerita.[13] Ante este vacío, juristas

---

[13]Ciertamente, distintos miembros de este Tribunal han intentado definir el alcance de tal cláusula mediante opiniones concurrentes, disidentes y de conformidad. Algunas de éstas ya han sido reseñadas en esta Opinión disidente. En las mismas, se encuentran expresiones reveladoras en torno al contenido y al propósito de la categoría de origen o condición social. En <u>Pueblo v. Caro González</u>, 110 DPR 518 (1980), por ejemplo, el Juez Asociado señor Díaz Cruz expuso en su Voto concurrente que la dignidad de los seres humanos no se diluye dependiendo de la condición social y la naturaleza del trabajo de las personas. Íd., pág. 534 (Díaz Cruz, Voto concurrente). Similarmente, en <u>Molina v. C.R.U.V.</u>, 114 DPR 295 (1983), el Juez Asociado señor Irizarry Yunque indicó en su Opinión concurrente que la categoría de origen o condición social constitucional proscribe que se discrimine contra persona alguna por su pobreza. Íd., pág. 312 (Irizarry Yunque, Opinión concurrente). De igual modo, en <u>Vega v. Luna Torres</u>, 126 DPR 370 (1990), el Juez Asociado señor Hernández Denton apeló en su Opinión concurrente y de

y catedráticos han propuesto distintas interpretaciones para esclarecer y precisar su contenido. Pasemos, pues, a analizar algunas de las metodologías propuestas.

Por un lado, el Juez Asociado y catedrático Raúl Serrano Geyls arguyó que la disposición constitucional sobre el discrimen por origen o condición social está íntimamente vinculada a la Sec. 20 de nuestra Carta de Derechos. R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, 1986, V. II, pág. 1189.[14] Como es conocido, la Sec. 20 reconoce los siguientes derechos económicos, sociales y culturales: (1) el derecho de toda persona a recibir gratuitamente la instrucción primaria y secundaria; (2) **el derecho de toda persona a obtener trabajo**; (3) el derecho de toda persona a disfrutar de un nivel de vida adecuado que asegure para sí y para su familia

---

conformidad a la prohibición del discrimen por condición social para sostener que las personas indigentes que hayan recibido servicios legales gratuitos tienen derecho a recibir honorarios de abogado como cualquier otra persona litigante. Íd., págs. 381-382 (Hernández Denton, Opinión concurrente y de conformidad).

[14]De igual modo, la Sec. 20 de la Carta de Derechos está íntimamente relacionada con la dignidad humana, la cual debe ser principio rector en nuestra interpretación constitucional. Véase, E. Vicente Rivera, Una mirada a la interpretación de los derechos económicos, sociales y culturales en las decisiones del Tribunal Supremo de Puerto Rico, 44 Rev. Jur. UIPR 17, 18 (2009); C. E. Ramos González, La inviolabilidad de la dignidad humana: Lo indigno de la búsqueda de expectativas razonables de intimidad en el Derecho Constitucional Puertorriqueño, 45 Rev. Jur. UIPR 185, 188-189 (2010); J. J. Álvarez González, La dignidad como derecho independiente, 45 Rev. Jur. UIPR 205, 214 n. 46 (2010).

la salud, el bienestar y especialmente la alimentación, el vestido, la vivienda, la asistencia médica y los servicios sociales necesarios; (4) el derecho de toda persona a la protección social en el desempleo, la enfermedad, la vejez o la incapacidad física, y (5) el derecho de toda mujer en estado grávido o en época de lactancia y el derecho de todo niño a recibir cuidados y ayudas especiales. Mediante estos postulados, la Convención Constituyente plasmó "[l]a importancia de esos valores para la sociedad puertorriqueña y, por ello, la justificación para exigir algo más que igualdad formal o igualdad de oportunidades para su disfrute". J. J. Álvarez González, Derecho Constitucional, 69 Rev. Jur. UPR 419, 452 (2000).

Por tanto, según la propuesta del Profesor, "los discrímenes sociales y económicos son particularmente problemáticos cuando operan en contextos que el malogrado Art. II, [Sec.] 20 consideró de especial importancia". J. J. Álvarez González, Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis S. A., 2009, pág. 896. Así, concluyó acertadamente que los discrímenes en los contextos de educación primaria y secundaria, trabajo, alimentación, vestido, vivienda y salud activan la categoría de origen o condición social. Lo anterior, es una manera muy acertada de dar contenido a la categoría que nos ocupa en aras de incorporar "nuevas protecciones a grupos históricamente

excluidos del disfrute de la más completa ciudadanía". Vicente Rivera, supra, pág. 24. Asimismo, se precisan sus contornos conforme a la voluntad propia del Pueblo puertorriqueño reflejada en la Convención Constituyente.

Ciertamente, el Congreso de los Estados Unidos eliminó posteriormente la precitada Sec. 20. Sin embargo, ello no es ni ha sido óbice para que este Tribunal adjudique las controversias ante así conforme a la voluntad del pueblo de Puerto Rico. Íd. Al contrario, hemos resuelto expresamente que "[e]l destino incierto de la frustrada Sec. 20 de nuestra constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado". Amy v. Administración de Deporte Hípico, 116 DPR 414, 421 (1985).

La Constitución de Puerto Rico busca garantizar el disfrute y goce cabal de los derechos humanos. En ese sentido, hemos reconocido que la propia Convención Constituyente vislumbró que estos derechos económicos, sociales y culturales se materializaran a través de otros pilares constitucionales. El delegado José Trías Monge lo expuso del siguiente modo:

> La palabra "vida" contiene toda una serie de derechos aparte del de la simple respiración, que no están incluidos necesariamente en la palabra "libertad" ni en la palabra "propiedad". O sea, de eliminarse la palabra "vida" de esta frase tan consagrada en la historia de este gran derecho, se estaría haciendo un cambio fundamental en cuanto [a eso], principalmente ahora que se está

expandiendo el área de los derechos humanos y ahora que se está reconociendo una segunda carta de derechos a la anterior clásica, tipo siglo XVII, y se están significando como derechos del hombre también en este documento, el derecho a la educación, el derecho al trabajo, el derecho a un nivel adecuado de vida. 2 Diario de Sesiones de la Convención Constituyente 1827 (versión digital).

Como bien explicó la profesora Esther Vicente Rivera, debe apreciarse "la claridad con que se expresa la acogida en nuestra Constitución de los derechos económicos, sociales y culturales, identificados como 'la segunda carta de derechos', más amplia que la 'anterior clásica'. **Estos derechos, necesarios para el debido desenvolvimiento de la personalidad humana, están comprendidos fundamentalmente en la palabra 'vida'"**. (Énfasis suplido). Vicente Rivera, <u>supra</u>, pág. 25. Es decir, a pesar de que la Constitución de Puerto Rico no reflejó finalmente la voluntad propia y original de Pueblo puertorriqueño, en la misma "aflora una vocación de crear un estado social y democrático" que se materializa en disposiciones constitucionales como la que tenemos ante nuestra consideración. Ramos González, <u>supra</u>. Así, los derechos consagrados en la Sec. 20 persisten en otras secciones de la Constitución, como en la prohibición de discriminar por origen o condición social. Aunque los derechos de la Sec. 20 no constan expresamente, sí forman parte de la aspiración real de la conciencia puertorriqueña.

Asimismo, es importante tener presente que **la propuesta del profesor Raúl Serrano Geyls se validó en el único precedente emitido por este Tribunal en torno a la categoría constitucional de origen o condición social**. En Pérez, Román v. Proc. Esp. Rel. de Fam., 148 DPR 201 (1999), este Tribunal determinó que las clasificaciones basadas en el estado civil de las personas no están cobijadas bajo la prohibición constitucional del discrimen por origen o condición social. Sin embargo, en su escolio 8, reconoció expresamente la metodología propuesta por el Profesor. Íd., pág. 214, n. 8. Ello, sugiere fuertemente que este Tribunal validó y legitimó tal análisis.

De igual modo, se ha propuesto otra metodología que complementa la interpretación anterior. A esos efectos, el profesor José R. Roqué Velázquez sugirió que la categoría de discrimen por origen o condición social se enmarque en la teoría o el principio de antisubyugación desarrollado por el profesor Lawrence Tribe. Roqué Velázquez, supra, pág. 537 (citando a L. Tribe, American Constitucional Law, 2da ed., New York, Ed. Foundation Press, 1988). Amparándose en la cláusula federal de igual protección de las leyes, la teoría de antisubyugación propone que "**todo esquema jurídico que trate a**

**ciertas personas como ciudadanos de segunda clase y cree o refuerce sistemas de subordinación, es presumiblemente inválido".** (Énfasis suplido). Álvarez González, <u>Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos</u>, <u>op. cit</u>. Por tanto, según el profesor José R. Roqué Velázquez, las dinámicas sociales que redunden en la subordinación de persona alguna estarían vedadas por la prohibición de discrimen por origen o condición social.

Por su parte, el profesor José Julián Álvarez González, ha validado la incorporación de tal metodología a la prohibición de discrimen por origen o condición social por las siguientes razones:

> Este modelo tiene la virtud de que reconoce límites a la discreción judicial, por cuanto requiere que quien invoque la protección vigorosa del proceso judicial bajo la prohibición contra discrímenes por origen o condición social demuestre que pertenece a un grupo que ha sido sometido históricamente a **tratamiento desigual y a estigma social.** (Énfasis suplido). Álvaréz González, <u>Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos</u>, <u>op. cit</u>.

A su vez, el profesor José R. Roqué Velázquez propuso unos criterios para limitar la aplicación de la teoría de antisubyugación y precisar adecuadamente las personas que están amparadas por tal disposición

constitucional. Así, el análisis propuesto se divide en tres (3) pasos. En primer lugar, los tribunales deben evaluar si "la sociedad en general le atribuye una **clasificación o connotación negativa**, ya sea por mitos, ignorancia o prejuicios, a los miembros de ese grupo, clase o individuos". (Énfasis suplido). Roqué Velázquez, <u>supra</u>. En segundo lugar, se debe auscultar si "a ese grupo, clase o individuos, se le ha sometido **históricamente a un grado convincente de opresión en la sociedad**". (Énfasis suplido). Íd. Por último, el tercer paso propuesto es que se demuestre evidencia del perjuicio o agravio causado por la clasificación negativa y la opresión ejercida socialmente. Íd. La evidencia de perjuicio o agravio puede consistir en prueba sobre la "**negación de empleo a la persona**, negación de servicios públicos o beneficios, privilegios injustos que se les ofrezcan a otras personas igualmente situadas", entre otras. (Énfasis suplido). Íd., pág. 538. Con frecuencia, el segundo paso y el tercero se complementarán. Íd.

### C.

Aclaradas las metodologías propuestas para precisar el alcance de la prohibición de discrimen por origen o condición social, procedemos a aplicar tal análisis para determinar si las personas exconvictas están cobijadas constitucionalmente.

Según adelantamos, para determinar si las personas exconvictas están amparadas en la prohibición de discrimen

por origen o condición social, debemos estudiar su realidad social. Entiéndase, debemos auscultar si esta población ha sido catalogada negativamente por la sociedad, si ha sido oprimida históricamente, y si lo anterior ha causado agravios y perjuicios. Lo anterior, conforme a la intención de la Convención Constituyente y a las metodologías propuestas.

Indudablemente, las personas exconvictas son estigmatizadas socialmente. Tanto es así, que miembros de la Convención Constituyente consignaron su preocupación en torno a la connotación negativa que la sociedad le ha otorgado a las personas confinadas. Así, el delegado Yldefonso Solá Morales señaló que las personas confinadas, en comparación a otras poblaciones vulnerables, "no son mirados de la misma manera" por la sociedad. 3 Diario de Sesiones de la Convención Constituyente 2678 (versión digital). Así lo reconoció igualmente el delegado Juan B. Soto al expresar lo siguiente:

> La teoría de la pena hasta ahora ha sido la de vindicación. Esto es, la vindicta pública. Todavía nosotros leemos en la prensa esa reacción pública de la vindicta pública; quiere decir, la venganza hacia el delincuente que ofendió [a] la sociedad; entonces la reacción social debe ser la misma de uno a quien le dan una bofetada en la cara, que debe reaccionar contra aquel que le agredió, agrediéndole también. Esa es la filosofía, en síntesis, que informa la legislación penal vigente en Puerto Rico y todavía en muchos países del mundo. Íd., pág. 2676.

De igual modo, es innegable que las personas confinadas y las exconfinadas han estado sujetas a una subordinación y opresión sistemática. Como expuso el doctor Luis A. Zambrana González:

> La población de personas privadas de su libertad es, probablemente, la más vulnerable en múltiples sentidos y aspectos, tanto sociales como jurídicos. Atender la precariedad y estigmatización que existe sobre ese sector de la población tan olvidado como despreciado es, no queda duda, una labor imperativa en un Estado democrático y constitucional de derecho. L. A. Zambrana González, La rehabilitación de la persona convicta como derecho humano: Su tención con el ordenamiento penitenciario de Puerto Rico, 87 Rev. Jur. UPR 1117, 1118 (2018).

En ese sentido, la poca literatura disponible al respecto muestra que la población penal de nuestras instituciones carcelarias responde a un desafortunado pero consistente perfil: personas que viven bajo los índices de pobreza, con poca educación y desempleadas. Un estudio sobre las personas confinadas en el año 2019 reflejó que aproximadamente el 65% vivían de un ingreso anual de $20,000 o menos previo a su encarcelamiento, sólo el 35% contaba con estudios hasta el duodécimo grado de escuela superior y el 88.37% provenía del sistema educativo público. Perfil de la población confinada 2019, Departamento de Corrección y Rehabilitación, noviembre 2019, págs. 26-27, 37-38, 48-49,https://www.estadisticas.pr/files/inventario/publicaciones-especiales/DC_perfil_poblacion_confinado_2019.pdf (última visita 12 de mayo de 2020). Asimismo, el 62.36% de las mujeres confinadas habían sido víctimas de violencia

doméstica, el 66.25% de la población confinada había padecido del trastorno de abuso de sustancias controladas y el 38% era reincidente de delito. Íd., págs. 56, 100, 194-196.

Estas estadísticas muestran que la condición de confinado o confinada no es una mera casualidad. Según puede observarse, la conducta delictiva de una persona está inevitablemente relacionada con su origen y condición social. Asimismo, estos datos revelan innegablemente que la población exconvicta acarrea, de por sí, una condición o estatus social de eminente desigualdad. A la luz de esta realidad, no cabe duda de que las personas exconvictas son un grupo históricamente marginado y oprimido por la sociedad.

Como agravante, y relevante a la controversia ante nos, las condiciones y las consecuencias del confinamiento no culminan cuando las personas confinadas cumplen la pena impuesta por el Estado. Al contrario, al intentar reintegrarse a la sociedad, las personas exconvictas se encuentran con una amplia gama de obstáculos fundamentados precisamente en los estigmas y la marginalización antes expuesta.

Entre las múltiples trabas a las que se enfrentan, se encuentra la falta de acceso a empleo. Particularmente, en el año fiscal del 2009 al 2010, la mayoría de las 4,946 personas egresadas de las instituciones penales de Puerto

Rico se encontraban desempleadas. Después de la cárcel no hay trabajo, Noticel, 26 de junio de 2011, https://www.noticel.com/la-calle/20110626/despues-de-la-carcel-no-hay-trabajo/ (última visita 12 de mayo de 2020). Según estudios en Estados Unidos, ello se debe primordialmente a que más del 60% de los patronos se niegan a contratar a personas con algún récord criminal. E. Westrope, Employment Discrimination on the Basis of Criminal History: Why an Anti-Discrimination Statute is a Necessary Remedy, 108 J. Crim. L. & Criminology 367, 370 (2018). Peor aún, tal decisión se basa frecuentemente en estereotipos infundados, en vez de un análisis individualizado sobre las características y experiencias de los aspirantes de empleo.[15] E. P. Weissert, Get out of Jail Free: Preventing Employment Discrimination against People with Criminal Records Using Ban the Box Laws, 164 U. Pa. L. Rev. 1529, 1536 (2016). Lo anterior, consiste en un impedimento grave a la reinserción social de las personas convictas.

A la luz de esta realidad, varios juristas puertorriqueños han coincidido en que las personas exconvictas indudablemente constituyen un grupo históricamente oprimido que está amparado en la prohibición

---

[15]Sin embargo, ningún estudio ha probado exitosamente la correlación entre la comisión de delitos en el contexto laboral con empleados con récords criminales. E. P. Weissert, Get out of Jail Free: Preventing Employment Discrimination against People with Criminal Records Using Ban the Box Laws, 164 U. Pa. L. Rev. 1529, 1537 (2016).

de discrimen por origen o condición social, en su segunda vertiente. A esos fines, el profesor José R. Roqué Velázquez sostuvo que las personas exconvictas cumplen con los tres (3) requisitos del esquema propuesto, pues los grupos dominantes que controlan el poder político y económico los "enfoca socialmente en lo más bajo de la jerarquía o estratificación", su "oportunidad de movilidad social, política y económica es irreal", y tienen evidencia plena de los perjuicios y agravios causados por ello. Roqué Velázquez, supra, págs. 537-538.

De igual modo, el secretario Eduardo J. Rivera Juanatey aplicó la metodología propuesta por el profesor José R. Roqué Velázquez y concluyó lo siguiente:

> Luego de utilizar este modelo de análisis sobre las clasificaciones, **resulta forzoso concluir que el grupo de los ex convictos es merecedor de protección constitucional.** La clasificación de ex convicto es una protegida dentro del concepto de condición social, toda vez que claramente la sociedad le atribuye una connotación negativa, el grupo históricamente ha sido sometido a un grado convincente de opresión y resulta evidente el perjuicio o agravio al cual están sometidos. (Énfasis suplido). Rivera Juanatey, supra, pág. 597.

A una conclusión similar llegó el Juez Asociado señor Rebollo López en su Opinión de conformidad en Rosario Díaz v. Toyota, 166 DPR 1 (2005) (Sentencia), a la cual se unieron el Juez Asociado señor Rivera Pérez y la Juez Asociada señora Fiol Matta. En la misma, sostuvo que el discrimen por condición social proscrito por la Constitución de Puerto Rico ampara a los **"miembros de un grupo específico de nuestra**

**sociedad, que por motivo de sus características en común y por tratase de un sector tradicionalmente estigmatizado, son objeto de marginación y trato diferencial".** (Énfasis en el original). Íd., pág. 21 (Rebollo López, Opinión de conformidad). Así, reconoció el estigma social que causa que las personas exconvictas sean marginadas de múltiples facetas de la sociedad, particularmente de la laboral. Íd., págs. 21-22 (Rebollo López, Opinión de conformidad). A la luz de lo anterior y de los preceptos constitucionales antes discutidos, concluyó que tras **"un análisis detenido y sosegado del asunto ante nuestra consideración nos lleva inexorablemente a concluir que la condición de exconvicto es un tipo de condición social protegido por nuestra Constitución".** (Énfasis en el original). Íd., pág. 21 (Rebollo López, Opinión de conformidad).

En vista de estas realidades, es innegable que la condición social de exconvicto o convicta es una categoría protegida constitucionalmente. Es evidente que la sociedad en general clasifica a las personas exconvictas negativamente y que se les ha sometido consecuente e históricamente a un grado significativo de opresión y subordinación. Ello, ha redundado en perjuicios tan graves como lo es la falta de un acceso adecuado a un trabajo. Ciertamente, aunque la condición de exconvicto o exconvicta no revela a primera vista rasgos naturales o inmutables como la raza, el color, el sexo o el nacimiento, sí cumple con un elemento importante de toda clasificación sospechosa,

entiéndase que "tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros". <u>Zachry International v. Tribunal Superior</u>, 104 DPR 267, 282 (1975). En consecuencia, es forzoso concluir que las personas exconvictas están cobijadas por la prohibición de discriminación por origen o condición social en su segunda vertiente.

**D.**

Todo lo anteriormente expuesto, cobra aún más importancia cuando consideramos que la Constitución de Puerto Rico exige igualmente el "tratamiento adecuado" de las personas que delinquen "para hacer posible su rehabilitación moral y social". Art. VI, Sec. 19, Const. PR, LPRA, Tomo 1. Tal disposición surgió de la Comisión de Disposiciones Transitorias y Asuntos Generales de la Convención Constituyente, quienes recomendaron inicialmente que constara la "política pública del Estado, propender, dentro de los recursos disponibles, a la rehabilitación moral y social de los reclusos".[16] 3 Diario de Sesiones de la Convención Constituyente 2541 (versión digital). Entre las 115 propuestas que tuvo la Comisión ante su

---

[16]La Comisión de Disposiciones Transitorias y Asuntos Generales tuvo la encomienda de recomendarle a la Convención Constituyente el contenido del Art. VI de la Constitución de Puerto Rico. A esos efectos, sus miembros redactaron un informe y lo presentaron ante la consideración de la Convención Constituyente. 3 Diario de Sesiones de la Convención Constituyente 2542-2543 (versión digital).

consideración, ésta determinó que la rehabilitación y la reinserción social de las personas convictas era un principio de tanta supremacía, que debía incluirse en nuestro texto constitucional. Íd., pág. 2542.

Ante la propuesta de la Comisión, el delegado José Veray Jr. Hernández sugirió enmendar el inciso sugerido para que leyera del siguiente modo: "[s]erá política pública del Estado reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender dentro de los recursos disponibles al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social". Íd., pág. 2672. Tal disposición generó un debate entre los constituyentes que es ilustrador en torno al propósito y el alcance de esta disposición constitucional.

Por un lado, el delegado Héctor González Blanes expresó su preocupación de que se trataba de "materia legislativa claramente" que no debía incluirse en la Constitución. Íd., pág. 2661. De igual modo, opinó que no entendía necesario incluir esa protección a favor de las personas confinadas: "[n]o veo la preeminencia, por importante que sea la situación de los reclusos, para incluirlos a ellos y no incluir a otras clases, posiblemente más necesitadas, como son los dementes, los sordomudos, los inválidos, por cuya rehabilitación se debe velar". Íd., pág. 2662.

Por otro lado, otros constituyentes resaltaron la urgencia de constatar este principio rector de

rehabilitación en aras de innovar fundamentalmente el sistema penitenciario y criminal de Puerto Rico. A esos fines, el delegado José Veray Jr. Hernández arguyó que "[l]a delincuencia es un problema de la comunidad y exige que el delincuente sea tratado en forma adecuada y científica. Este principio constitucional aparece establecido en quince países en Sur América de los veintiuno que existen y además en varios estados de Estados Unidos". Íd.

Similarmente, el delegado Juan B. Soto, expresó que la legislación arcaica de Puerto Rico exigía un cambio oficial sobre la filosofía y el objetivo de la pena de Puerto Rico. Íd., pág. 2676. Resaltó que las palabras "tratamiento" y "rehabilitación" "a primera vista nada significan, pero que, dentro de la nueva tendencia y de la nueva ciencia penal, tienen un valor y un alcance extraordinario". Íd. De este modo, indicó que las personas no se deben encarcelar con un propósito punitivo, pues "está demostrado científicamente, que ese maltrato no reforma, sino lo que hace es determinar reacciones violentas de indignación en el delincuente". Íd., pág. 2677. Asimismo, en consideración al impacto y la importancia de la disposición constitucional propuesta, caracterizó la misma como "una de las enmiendas más útiles, de mayor alcance social, de las que más prestigio podría dar a esta Convención, por el espíritu y por la forma en que enfrenta uno de los problemas más graves con que se ha confrontado siempre la humanidad". Íd., págs. 2677-2678.

Cónsono con lo anterior, el delegado Yldefonso Solá Morales resaltó la necesidad de garantizar un "margen de garantía y de seguridad de reforma" para las personas que delinquen. Íd., pág. 2679. Así, la importancia de "consignar aquí la forma en que miramos y enfocamos el problema ahora, y, a nombre de esa sociedad procurar llegar al logro de devolverle a la sociedad, si es posible, por cada delincuente, una persona regenerada y útil en el seno de esa sociedad en que va a convivir". Íd.

Finalmente, la enmienda propuesta fue aprobada unánimemente. Íd. De este modo, prevaleció una visión promovedora de la rehabilitación y del trato humano de las personas confinadas. Lo anterior, fundamentado principalmente en el reconocimiento pleno de que las personas confinadas eran, y continúan siendo, oprimidas y marginalizadas por la sociedad y por las instituciones de poder.

Por tanto, nos toca a los operadores jurídicos materializar esa intención de la Convención Constituyente y darle contenido a la protección plasmada en la Constitución de Puerto Rico. Desafortunadamente, esta disposición constitucional tampoco ha sido objeto de la interpretación judicial que necesita para tener fuerza vinculante. Como bien señaló el profesor Fernando Picó:

> Si el propósito principal de la cárcel es rehabilitar, como dice la Constitución puertorriqueña de 1952, ¿qué quiere decir esa palabra? Los diccionarios nos dicen que

rehabilitar significa reponer en su antiguo estado o condición a una persona o cosa. En ese caso, ¿cuál sería el antiguo estado o condición al que queremos devolver a los confinados? ¿Qué vuelvan a la calle en las mismas condiciones en que estaban antes de delinquir? ¿Devolver al que dejó la escuela al séptimo grado del que salió, al desempleo en que se encontró? ¿Eso es rehabilitar? No hay cosa más tramposa que el lenguaje metafórico. **Hemos estado usando metafóricamente la palabra rehabilitación todos estos años, sin conocer a ciencia cierta sus implicaciones.** Los franceses prefieren la palabra resocialización, pero allá también se objeta la inferencia de que alguna vez estuvieron socializados lo que ahora se quiere reinsertar en el tejido social.

**Si aventuramos la idea de que el concepto mayoritario en torno a la rehabilitación de los confinados gira sobre la capacitación de éstos para que se puedan desempeñar con dignidad y provecho en la sociedad, avanzamos un paso.** Pero, ¿cómo se logra este propósito? ¿Es algo pasivo, al cual el confinado se somete, o es algo activo, que requiere su participación e interacción? Y si es lo segundo, ¿cuáles programas o tratamientos mejor configuran esa acepción de la rehabilitación? (Énfasis suplido). F. Picó, La caducidad de la cárcel, 60 Revista Colegio de Abogados de Puerto Rico, Núm. 2, pág. 13.

En consecuencia, es hora de precisar el alcance de esta disposición constitucional que se repite consecuentemente en todo documento legislativo, administrativo y judicial relacionado con la población confinada. En esa encomienda, nos corresponde pautar que el mandato a la rehabilitación dispuesto en la Constitución de Puerto Rico sostiene igualmente la prohibición de discriminar en contra de alguna persona por su condición social de exconvicta.

Alcanzada esa conclusión, pasemos a evaluar sus efectos en el Derecho privado laboral.

**E.**

Según hemos discutido extensamente, la Sec. 1 de la Carta de Derechos de la Constitución de Puerto Rico prohíbe el discrimen motivado por raza, color, sexo, nacimiento, origen o condición social, ideas políticas e ideologías religiosas. Art. II, Sec. 1, Const. PR, LPRA, Tomo 1. Este Tribunal ha resuelto consecuentemente que "[e]stos preceptos de raigambre constitucional **rigen** en el ámbito obrero-patronal y están instrumentados en la Ley Núm. 100". (Énfasis suplido). S.L.G. Afanador v. Roger Electric Co. Inc., 156 DPR 651, 661 (2002). Véase, Rodríguez Meléndez v. Sup. Amigo, Inc., 126 DPR 117, 124 (1990). A esos efectos, la Ley contra el discrimen en el empleo, Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec. 146 et seq., prohíbe y penaliza el discrimen en el empleo. De este modo, el referido estatuto materializa la política constitucional consagrada en nuestra Carta de Derechos al proteger a las personas que aspiran a un empleo y, a los trabajadores y trabajadoras. Santini Rivera v. Serv. Air, Inc., 137 DPR 1, 4-5 (1994).

Desde su aprobación, la Ley Núm. 100 se ha enmendado en varias ocasiones para añadir distintas categorías por las cuales los patronos privados no pueden discriminar. Actualmente, la precitada ley proscribe el discrimen en el contexto obrero-patronal privado motivado por las siguientes razones:

> [E]dad, según ésta se define más adelante, raza, color, sexo, orientación sexual, identidad de

género, **origen social o nacional, condición social**, afiliación política, o ideas políticas o religiosas, o por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, o por ser militar, ex-militar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o por ostentar la condición de veterano del empleado o solicitante de empleo. (Énfasis suplido). 29 LPRA sec. 146.

Las referidas clasificaciones prohibidas en la Ley Núm. 100, al igual que las categorías dispuestas en la Secc. 1 de la Carta de Derechos, **no** son exhaustivas. Ello es así, pues este Tribunal ha reiterado que las categorías proscritas por la Ley Núm. 100 están íntimamente vinculadas a la Sec. 1 de la Carta de Derechos. Meléndez Rivera v. CFSE, 195 DPR 300, 306 (2016); García Pagán v. Shiley Caribbean, etc., 122 DPR 193, 198 (1941). Como explicó el profesor Jorge M. Farinacci Fernós: "la [Sec.] 1 opera, en todo su alcance, mediante la Ley Núm. 100, incluyendo su naturaleza **expansiva y no-taxativa**". (Énfasis suplido). J. M. Farinacci Fernós, Igual trato por igual trabajo: Las clasificaciones laborales irracionales y el trato desigual en el empleo privado, 50 Rev. Jur. UIPR 311, 326 (2015).

Por tanto, como bien reconoce la Opinión mayoritaria, "[n]o existe razón para concluir que la categoría de condición social en dicha legislación es sustantivamente distinta a aquella protegida por la Constitución". Opinión mayoritaria, pág. 17. En consecuencia, el contenido y el alcance de su prohibición de discrimen por condición social está circunscrito al análisis constitucional antes expuesto.

Entiéndase, los patronos privados no pueden tomar acciones adversas contra aspirantes de empleo, empleados o empleadas, fundamentadas en alguna de las vertientes siguientes: (1) origen o procedencia social de la persona, (2) o la condición, la cultura o el estatus social de la persona. Según discutido, esta segunda vertiente cobija a las personas exconvictas. Igualmente, al ser el derecho al trabajo uno de los principios consagrados en la Secc. 20 de la Constitución de Puerto Rico, esta prohibición cobra aún más importancia en este contexto.

Ahora bien, al aplicar esta prohibición en el ámbito laboral, hay que tomar en consideración los distintos intereses en pugna. Lo anterior, debido a que la protección de los derechos individuales requiere, a su vez, el respeto por los derechos de la comunidad en su vida, salud y bienestar. Art. II, Sec. 19, Const. PR, LPRA, Tomo 1.

Por tanto, debemos tener presente que, por un lado, se encuentra el derecho constitucional a que no se discrimine en contra de una persona a razón de su condición de exconvicta. Cónsono con ello, existe una disposición constitucional que exige esfuerzos concretos de rehabilitación para las personas exconvictas. Indudablemente, el empleo es un componente imprescindible de esta rehabilitación y reinserción social.[17] Por otro lado,

---

[17]Se ha demostrado consecuentemente que el desempleo está íntimamente relacionado con la reincidencia. A. Christman & M.

se encuentra el "valor e interés patronal, también protegido, de velar por las prerrogativas gerenciales que el sistema económico le reconoce a este último". Díaz v. Wyndham Hotel Corp., 155 DPR 364, 382 (2001). En consecuencia, en una controversia de esta naturaleza, debemos delinear unos parámetros que permitan el adecuado balance entre estos intereses.

Precisamente, el Juez Asociado señor Rebollo López en su Opinión de conformidad en Rosario Díaz v. Toyota, supra, expuso una metodología efectiva para sopesar los intereses en pugna. A esos efectos, concluyó que los patronos pueden

---

Natividad Rodríguez, Research Supports Fair Chance Policies, National Employment Law Project, agosto 2016, pág. 2, https://s27147.pcdn.co/wp-content/uploads/Fair-Chance-Ban-the-Box-Research.pdf (última visita 12 de mayo de 2020). Particularmente, estudios han revelado que la falta de un empleo es el factor más importante y decisivo en la reincidencia. Íd. Es por ello que la Comisión de Derechos Civiles de Puerto Rico ha recomendado que el Estado promueva que las personas exconvictas tengan un acceso adecuado a empleo, pues "[s]e parte de la idea de que una forma efectiva de evitar la reincidencia es que la persona consiga empleo tan pronto salga de la prisión". Análisis del sistema correccional puertorriqueño: Modelos de rehabilitación, Comisión de Derechos Civiles, 2009, pág. 79, https://observatoriocorreccionalpr.org/wp-content/uploads/2011/01/LibroCorreccion_2009.pdf (última visita 12 de mayo de 2020).

Igualmente, evidencia empírica ha revelado que cuando las personas exconvictas tienen acceso a empleos la sociedad en general se beneficia significativamente. Además de representar una oportunidad concreta de rehabilitación y reinserción social, las sociedades prosperan económicamente en virtud de ese recurso humano. Asimismo, las oportunidades de empleos a personas con convicciones previas han demostrado generar mayor seguridad pública. De igual modo, estudios demuestran que las familias y los menores de edad se benefician de ello. Véase, Research Supports Fair Chance Policies, supra, págs. 2-3.

tomar una decisión motivada por la cualidad de exconvicto de una persona, a modo excepcional, **"cuando las circunstancias particulares del caso así lo aconsejen"**. (Énfasis en el original). Íd., pág. 26 (Rebollo López, Opinión de conformidad). Para determinar qué circunstancias apremiantes justifican tal decisión, acudió a jurisdicciones estatales estadunidenses en las cuales se les exige a los patronos que contemplen una serie de factores al enfrentarse a un aspirante de empleo con un récord criminal. En virtud de lo anterior, propuso los siguientes criterios para guiar la discreción de los patronos:

1. La **naturaleza** y **gravedad** del delito cometido.
2. La **relación** entre el delito cometido, el empleo solicitado y los requisitos y la responsabilidad que el trabajo conlleva.
3. El **grado de rehabilitación** del solicitante y cualquier información que el solicitante o un tercero pueda legítimamente brindar al respecto.
4. Las **circunstancias** bajo las cuales se cometió el delito, incluyendo las circunstancias atenuantes o particulares existentes al momento de su comisión.
5. La **edad** del solicitante al cometer el delito.
6. El **tiempo transcurrido** ante la convicción y la solicitud de empleo.
7. El **interés legítimo** del patrono en proteger la propiedad, la seguridad y el bienestar propio, de terceros o del público en general. (Énfasis en el original). Íd., págs. 26-27 (Rebollo López, Opinión de conformidad).

Así, al evaluar una solicitud de un aspirante, los patronos tendrán que realizar un estudio integral e individualizado de los y las candidatas para sopesar los factores reseñados y tomar una decisión bajo un criterio de

razonabilidad. Solo si un estudio de esos factores revela un riesgo excesivo a los intereses de la comunidad, se podrá justificar el discrimen. De este modo, se promueve que los patronos no actúen conforme a prejuicios, estereotipos ni criterios arbitrarios. Al contrario, mediante este análisis, garantizamos que las convicciones criminales se tomen en consideración únicamente para propósitos legítimos.

Asimismo, es menester destacar que el análisis propuesto por el Juez Asociado Rebollo se fundamentaba en aquel momento en la legislación de seis (6) estados que prohibían el discrimen por convicciones previas en el empleo. Íd., pág. 26 (Rebollo López, Opinión de conformidad). Actualmente, **treinta y cinco (35) estados** han implantado políticas que desalientan la discriminación en contra de aspirantes de empleo por su calidad de exconvicto. B. Avery, Ban the Box – Fair Chance Guide, National Employment Law Project, julio 2019, págs. 3-25 https://www.nelp.org/publication/ban-the-box-fair-chance-hiring-state-and-local-guide/, (última visita 26 de mayo de 2020). Particularmente, **doce (12) de esos estados** exigen que se evalúe el historial criminal de un o una aspirante según los criterios antes señalados.[18] Íd. Específicamente, han

---

[18]Específicamente, se trata de los estados siguientes: California, Colorado, Delaware, Hawái, Minnesota, Nevada, Nuevo México, Nueva York, Ohio, Pensilvania, Tennessee y Virginia. Ban the Box – Fair Chance Guide, National Employment Law Project, julio 2019, págs. 3-25. https://www.nelp.org/publication/ban-the-box-fair-chance-

dispuesto que sólo se pueden tomar en consideración convicciones previas si éstas tienen una relación **directa y razonable** a la posición de empleo en controversia.[19]

A la luz de lo anterior, los patronos privados en Puerto Rico no deben tener carta blanca para

---

hiring-state-and-local-guide/, (última visita 26 de mayo de 2020).

[19]A nivel federal, el Título VII de la Ley de Derechos Civiles de 1964, 42 USC sec. 2000e et seq., prohíbe la discriminación en el contexto laboral basada en raza, color, religión, origen nacional o sexo. Íd., sec. 2000e-2(a)(1). Conforme a tal estatuto, en el ordenamiento federal sólo se prohíben discrímenes fundamentados en convicciones previas si se demuestra que el patrono implantó una política que tuvo un impacto dispar (disparate impact) en alguna de las categorías reseñadas. Griggs v. Duke Power Co., 401 US 424, 430-431 (1971). Es decir, que la política relacionada con el historial criminal de los aspirantes tuvo un efecto desproporcionalmente negativo en alguna de las poblaciones vulnerables protegidas por el estatuto.

A pesar de lo anterior, la Comisión para la Igualdad de Oportunidades en el Empleo (EEOC, por sus siglas en inglés) -entidad encargada de implantar el Título VII de la Ley de Derechos Civiles de 1964, supra- adoptó unas normas que desalientan significativamente el discrimen fundamentado en convicciones previas en el ámbito laboral, independientemente de la población de que se trate. Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., U.S. Equal Employment Opportunity Commission, 25 de abril de 2012, https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions (última visita 26 de mayo de 2020). A esos efectos, las normas adoptadas proveen lo siguiente: "As a best practice, and consistent with applicable laws, the Commission recommends that employers not ask about convictions on job applications and that, if and when they make such inquiries, the inquiries be **limited to convictions for which exclusion would be job related for the position in question** and consistent with business necessity".(Énfasis suplido). Íd., sec. (V)(B)(3).

discriminar en contra de personas exconvictas. La prohibición de discrimen por origen o condición social y el mandato constitucional a la rehabilitación nos impiden de resolver que se le puede negar a una persona un derecho tan fundamental como el trabajo por razones especulativas y prejuiciados. Al contrario, nuestra Constitución de avanzada nos exige que, en el balance de intereses, los patronos ausculten y precisen si la convicción criminal previa de una persona tiene una relación directa y razonable con la posición de empleo en pugna. Mediante un estudio individualizado y cuidadoso de los criterios antes reseñados, protegemos los derechos de todas las partes envueltas.

Expuesto el derecho aplicable, procedemos a exponer las razones del disenso.

## III.

En el caso ante nuestra consideración, el Dr. Jorge Garib Bazain (doctor Garib Bazain) operó en el Hospital Español Auxilio Mutuo de Puerto Rico (Auxilio Mutuo) desde el año 1982. Sin embargo, en el año 2000, fue convicto en la Corte de Distrito Federal para el Distrito de Puerto Rico por los delitos de fraude, apropiación y malversación de

fondos públicos. Debido a lo anterior, el Auxilio Mutuo le retiró los privilegios médicos.

Posteriormente, el doctor Garib Bazain cumplió la pena impuesta y logró la reinstalación de su licencia médica. Por tanto, en el año 2009, solicitó al Auxilio Mutuo que le concedieran nuevamente los privilegios médicos. Ante ello, el Auxilio Mutuo le remitió una carta en la cual se le informó que el Comité Ejecutivo del hospital no estaría recomendando la concesión de los privilegios **debido a su convicción criminal.**[20] Diligentemente, el doctor Garib Bazain solicitó la celebración de una vista evidenciaria y la producción de documentación que entendía necesaria para su defensa. Por su parte, el Auxilio Mutuo denegó la vista solicitada, tardó entre tres (3) a cinco (5) meses en entregar la documentación que tenía en su posesión y posteriormente confirmó la denegación de los privilegios.

Debido a lo anterior, el doctor Garib Bazain presentó una demanda de sentencia declaratoria,

---

[20]En la misiva, el Hospital Español Auxilio Mutuo de Puerto Rico (Auxilio Mutuo) hizo referencia a otros dos (2) incidentes previos que ocurrieron durante las labores del del Dr. Jorge Garib Bazain (doctor Garib Bazain) en los años 1982 y 1995. Dichos eventos nunca dieron paso a determinación disciplinaria alguna. Por tanto, al igual que la Mayoría, entendemos que es innegable que la motivación real para la negación de los privilegios médicos recayó en la convicción criminal del doctor Garib Bazain.

injunction y daños y perjuicios en contra del Auxilio Mutuo. Así, arguyó que el Auxilio Mutuo discriminó en su contra por su condición de exconvicto.[21] Ante ello, el Auxilio Mutuo ha argumentado ante los foros judiciales que la Constitución de Puerto Rico no proscribe el discrimen fundamentado en la convicción previa de una persona. El Tribunal de Primera Instancia declaró con lugar la demanda presentada y, entre varios asuntos, ordenó al Auxilio Mutuo a extender inmediatamente los privilegios médicos al

---

[21]Además, el doctor Garib Bazain alegó que el Auxilio Mutuo violó su debido proceso de ley. Particularmente, la ley federal Health Care Quality Improvement Act, 42 USC sec. 11112, provee que las instituciones médicas deberán salvaguardar ciertos requisitos procesales al denegar los privilegios médicos a un profesional de la salud. A esos efectos, dispone que los hospitales deben garantizar un proceso justo y razonable, proveer una notificación adecuada y celebrar una vista para que el doctor o la doctora sea escuchada. Íd. De igual modo, requiere que las decisiones de las instituciones médicas tengan como propósito proveer un cuidado médico adecuado, que se ejerzan esfuerzos razonables para obtener la información relacionada con los hechos del caso y que sus decisiones se basen en el expediente. Íd. Ahora bien, los hospitales no están obligados a cumplir con estas normas. Sin embargo, si cumplen con las mismas, el referido estatuto dispone que la institución médica **gozará de inmunidad en contra de una acción en daños y perjuicios**. Íd., sec. 11111.

A la luz de lo anterior, la Opinión mayoritaria resuelve erróneamente que a pesar de que "en este caso no se cumplieron con los requisitos federales", el doctor Garib Bazain no tenía una causa de acción en contra del Auxilio Mutuo. Opinión mayoritaria, pág. 26 n. 10. Precisamente, al reconocer expresamente que el Auxilio Mutuo no cumplió con la normativa federal, queda claro que no le cobija la inmunidad reconocida por ley. Por ende, la demanda en daños y perjuicios instada por el doctor Garib Bazain procedía en derecho.

doctor Garib Bazain. Particularmente, el foro primario concluyó que "ni en el proceso de la denegación de los privilegios médicos, ni en este litigio se pudo refutar el hecho de que el [doctor Garib Bazain], luego de cumplir su sentencia, está rehabilitado y no existe un obstáculo legítimo para el ejercer la profesión médica y ser acreedor a sus privilegios médicos en el Hospital".[22] El Tribunal de Apelaciones confirmó el dictamen del Tribunal de Primera Instancia.

A la luz de estos hechos, la Opinión mayoritaria suscribe un análisis literal y formalista que valida el discrimen rampante e injustificado en contra de las personas exconvictas. Así, pauta que la prohibición de discriminar a razón del origen o la condición social de una persona se limita a fundamentos socioeconómicos. Por tanto, concluye que tanto la Constitución de Puerto Rico como la Ley Núm. 100 permiten que los patronos se nieguen injustificadamente a emplear a personas con convicciones criminales previas.

Tal análisis no tiene cabida en nuestro ordenamiento. Hoy procedía resolver que la prohibición constitucional de discriminar por el origen o la condición social de una persona protege

---

[22]Apéndice de certiorari, Sentencia Parcial, pág. 66.

a las personas exconvictas de delito. Según discutido, los derechos que garantiza y provee la Constitución de Puerto Rico no pueden analizarse aislada y literalmente. Al contrario, exigen que evaluemos la controversia ante nuestra consideración a la luz de derechos y principios de la más alta supremacía, como lo son la dignidad humana, la igualdad y la rehabilitación.

Empleado ese análisis, era forzoso concluir que la prohibición constitucional de discriminar por origen o condición social proscribe dos (2) tipos de discrimen: (1) aquel fundamentado en el origen o la procedencia social de una persona, y (2) aquel basado en la cultura, naturaleza o el estatus social de una persona. Mediante esta segunda vertiente, se prohíbe el discrimen en contra de grupos o personas que han sido clasificadas negativamente, oprimidas históricamente y quienes hayan sufrido agravios o perjuicios a raíz de ello.

Así, al aplicar estos criterios a las personas exconvictas, no hay duda alguna de que éstas están amparadas por la Sec. 1 de la Carta de Derechos. Como expusimos anteriormente, la sociedad puertorriqueña, como ocurre comúnmente en otros países, clasifica y discrimina negativamente a las personas exconvictas. A raíz de ello, los derechos más básicos de esta comunidad se ven coartados constantemente, tales como

su acceso a vivienda adecuada, empleo, estudios, entre otros. Lo anterior vislumbra una realidad innegable: las personas exconvictas componen uno de los grupos más marginados, vulnerables y estigmatizados en nuestra sociedad. Por tanto, hoy procedía resolver que la Secc. 1 de la Carta de Derechos les cobija y les protege de discriminación basada en su convicción criminal previa.

Todo lo anteriormente expuesto cobra aún más importancia cuando consideramos que, en el caso de autos, se le privó al doctor Garib Bazain de uno de los derechos fundamentales reconocidos en nuestra sociedad y plasmado así en la Sec. 20 de la Constitución de Puerto Rico: el derecho al trabajo. Recordemos, pues, que "[e]l derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas". Amy v. Administración de Deporte Hípico, supra. En ese sentido, los intereses del doctor Garib Bazain están vinculados a otras garantías individuales contenidas expresamente en la Constitución de Puerto Rico que proscriben este proceder.

Asimismo, debemos tener presente que el acceso adecuado a empleos para personas con convicciones criminales no sólo es beneficioso para la comunidad.

Ello redunda igualmente en mayor seguridad pública, en el fortalecimiento de los vínculos familiares e impulsa la economía en general. Irónicamente, al denegar el disfrute del derecho básico del trabajo, se promueve la reincidencia y la criminalidad.

Cónsono con lo anterior, procedía resolver que la Constitución de Puerto Rico prohíbe la discriminación en el empleo fundamentado en una convicción criminal previa. A su vez, al aplicar esta prohibición constitucional al ámbito laboral, procedía delinear un esquema que sopesara los distintos intereses en pugna. A esos efectos, se debió resolver que los patronos no pueden negar un empleo a una persona únicamente porque tiene un récord criminal. Ello valida prejuicios estereotipados e infundados.

Al contrario, hoy tocaba pautar que los patronos sólo pueden tomar en consideración la convicción criminal de algún o alguna aspirante cuando la misma esté razonable y directamente relacionada con la posición de empleo en controversia. Así, los patronos podrían, a modo excepcional, justificar la denegación de empleo a una persona exconvicta si un análisis de los criterios antes mencionados revela un riesgo excesivo y particularizado a sus operaciones. Según hemos expuesto anteriormente, estas prácticas "ayuda[n] a descartar la presunción de que una

persona acusada y, hasta convicta, de delito es incapaz de reinsertarse como un miembro productivo de la sociedad". González Santiago v. Baxter Healthcare of Puerto Rico, 202 DPR 281, 305 (2019) (Estrella Martínez, Opinión disidente).

A la luz de lo anterior, el Auxilio Mutuo debió realizar un análisis individualizado del récord criminal del doctor Garib Bazain y determinar si, en virtud de los criterios antes expuestos, se justificaba la denegación de su empleo. Denegarle el empleo, sin más, es a todas luces un acto discriminatorio fundamentado en la condición de exconvicto del doctor Garib Bazain y, por ende, inconstitucional.

Desafortunadamente, lo que ocurrió con el doctor Garib Bazain no es una excepción. El discrimen y el perjuicio que sufren los exconvictos suele recrudecerse, incluso más que en otros sectores discriminados laboralmente. A pesar de ello, hoy se despachan derechos fundamentales protegidos por la Constitución de Puerto Rico y se priva a una de las comunidades más marginadas y oprimidas de un derecho tan básico como lo es el trabajo. Los derechos a la igualdad, a la dignidad y a la rehabilitación, en lugar de materializarse, siguen desvaneciéndose.

Precisamente, esta controversia exigía dar contenido y precisar el alcance de estas

disposiciones constitucionales y concretizar la intención de la Convención Constituyente. Sin embargo, la Opinión mayoritaria obvia estos principios, causando que éstos se mantengan en formalismos abstractos y teóricos.

No podemos sostener una democracia basada en la igualdad y en la dignidad mientras damos carta blanca a los patronos para que discriminen libre e injustificadamente en contra de las personas que tienen récords criminales. Sin duda alguna, validar este proceder subordina y marginaliza aún más a las personas exconvictas. En consecuencia, disiento enérgicamente del dictamen mayoritario.


                              Luis F. Estrella Martínez
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jorge Garib Bazaín

     Recurrido

          v.

Hospital Español Auxilio
Mutuo de Puerto Rico, Inc.
y otros

     Peticionarios

CC-2018-0530     *Certiorari*

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 27 de julio de 2020.

Hace ya más de quince (15) años atrás a este Tribunal se le presentó la oportunidad de poder determinar si la protección en contra del discrimen por condición social -- contenida en el Art. II, Sec. 1, de la Constitución del Estado Libre Asociado de Puerto Rico -- podía ser invocada por aquellas personas que ven frustradas sus oportunidades de conseguir un empleo digno por el hecho de haber sido convictos de delito. En aquella ocasión, al tres miembros de esta Curia responder en la afirmativa y tres en la negativa, y quedar igualmente dividido el Tribunal, no se pudo pautar una norma que brindara una respuesta definitiva a la controversia ante nuestra consideración.

Hoy -- en un proceder en extremo lamentable -- una mayoría de jueces de este Tribunal decide, de una vez por todas, ponerle fin a la referida controversia, y al así hacerlo, optan por "ignorar las lamentables vicisitudes que confrontan las personas convictas de delito a la hora de procurar empleo". *Rosario v. Toyota*, 166 DPR 1, 3 (Sentencia) (Op. de Conformidad del Juez Asociado señor Rebollo López).

Por entender que la prohibición contra el discrimen por condición social dispuesta en el Art. II, Sección 1, de la Constitución de Puerto Rico, *infra*, -- y extendida al ámbito obrero-patronal por la Ley Núm. 100 de 30 de junio de 1959, *infra* -- cobija a las personas convictas de delito que han cumplido su sentencia, disentimos enérgicamente del errado curso de acción seguido por una mayoría de este Tribunal en el presente caso.

Al así proceder, procuramos dar vida también a aquel postulado constitucional -- contemplado en el Art. VI, sec. 19, de la Constitución del Estado Libre Asociado de Puerto Rico, *infra* -- que procura hacer posible la rehabilitación moral y social de aquellas personas que delinquen. Veamos.

I.

Allá para el año 2000, el doctor Jorge Garib Bazaín (en adelante, "doctor Garib Bazaín") resultó convicto por los delitos de fraude, apropiación y malversación de fondos públicos. Como consecuencia de ello, el Hospital Español

Auxilio Mutuo, Inc. (en adelante, "Hospital Español Auxilio Mutuo") le retiró los privilegios clínicos que tenía en dicha institución y en abril del 2004 el Tribunal Examinador de Médicos (en adelante, "Tribunal Examinador") revocó su licencia médica.

Posteriormente, en diciembre de 2007, el doctor Garib Bazaín extinguió su sentencia, por lo que solicitó al Tribunal Examinador que reinstalara su licencia para practicar la medicina. El 27 de enero de 2009, tras varios trámites administrativos y judiciales no necesarios aquí pormenorizar, el Tribunal Examinador accedió a dicha petición.

Así las cosas, en febrero de 2009, el doctor Garib Bazaín solicitó al Hospital Español Auxilio Mutuo que le extendiera nuevamente sus privilegios clínicos. No obstante, nueve meses después, el doctor Álvaro Aranda, presidente de la Facultad Médica y del Comité Ejecutivo de la referida institución hospitalaria, le informó mediante una carta que el Comité había determinado no recomendar la concesión de los privilegios. **Esta decisión, en esencia, se basó en las previas convicciones federales del doctor Garib Bazaín.**[23]

---

[23] En la carta denegando privilegios al al doctor Garib Bazaín, se le informa a éste que el Comité Ejecutivo del hospital "gained knowledge that your clinical privileges to participate in the Emergency Room On-call Duty Roster during your Residency Program at the Veteran's Administration (VA) Hospital were curtailed due to an incident with a patient to which you resisted his/her attempt of battery and assault with a firearm." Apéndice del *certiorari*, pág. 283. Asimismo, se le indicó que el Comité Ejecutivo entendía que "your conviction for conspiracy to commit offence or defraud the United States of America is indeed related to your professional conduct. Being in the position

Ante dicha determinación, el 25 de marzo de 2010 el doctor Garib Bazaín presentó una demanda de sentencia declaratoria, *injunction*, y daños y perjuicios en contra del Hospital Español Auxilio Mutuo y otros demandados. En síntesis, éste alegó que le fueron denegados privilegios médicos en la referida institución hospitalaria de manera discriminatoria e ilegal -- ello debido a su condición de exconvicto -- y que se le violó su debido proceso de ley durante el procedimiento de revisión de dicha determinación.

El 28 de febrero de 2017, el Tribunal de Primera Instancia emitió una *Sentencia parcial*, mediante la cual determinó que el Hospital Español Auxilio Mutuo violó el debido proceso de ley y discriminó en contra del doctor Garib Bazaín por su condición social de persona convicta de delito. Además, resolvió que la referida institución hospitalaria violó los derechos procesales del demandante al denegarle la vista y el descubrimiento de prueba. Consecuentemente, ordenó a los peticionarios conceder los privilegios al doctor Garib Bazaín.

Inconforme, el Hospital Español Auxilio Mutuo acudió en apelación ante el Tribunal de Apelaciones. No obstante, el 2 de mayo de 2018, el foro apelativo intermedio emitió una *Sentencia* en la que -- luego de acoger el recurso como *certiorari* -- confirmó al foro primario. Coincidió en que

---

of a physician specialized in infectious diseases you misused or allowed the misuse of federal funds designated for patients suffering from a serious infection disease." *Íd.*, pág. 284.

el Hospital Español Auxilio Mutuo violó los derechos procesales del doctor Garib Bazaín y discriminó en su contra por su condición de persona convicta de delito, a pesar de que la prueba en el expediente demostraba que éste se había rehabilitado.

Insatisfecho aún, el Hospital Español Auxilio Mutuo acude ante nos a través del recurso que nos ocupa. En esencia, plantea que el Tribunal de Apelaciones erró al concluir que la referida institución hospitalaria había discriminado en contra del doctor Garib Bazaín por ser persona convicta de delito. A dicha solicitud el doctor Garib Bazaín se opuso.

Examinados los planteamientos de ambas partes, una mayoría de este Tribunal decide que la clasificación de "persona convicta de delito" no se encuentra cobijada por la categoría de origen o condición social protegida por nuestra Constitución y la legislación que prohíbe el discrimen en el empleo. De esta forma, determina que la denegatoria de privilegios médicos al doctor Garib Bazaín no constituyó un acto discriminatorio ilegal.

Como ya adelantamos, de ese lamentable proceder enérgicamente disentimos. Ello, pues entendemos que las personas convictas de delito, que ya han cumplido su sentencia, están protegidas por la prohibición contra el discrimen por condición social contenida en el Art. II, Sección 1 de la Constitución de Puerto Rico, *infra*,

extendida al ámbito obrero-patronal por la Ley Núm. 100 de 30 de junio de 1959, *infra*. Veamos.

II.

A.

Como es sabido, la Constitución del Estado Libre Asociado de Puerto Rico, en su Artículo II, Sección 1, prohíbe el establecimiento de "discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o **condición social**, ni ideas políticas o religiosas". (Énfasis suplido) Const. PR., Art. II, Sec. 1, LPRA, Tomo 1. Dicha sección, la cual forma parte de nuestra Carta de Derechos, dispone, además, que "[t]anto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana". *Íd*.

Según ha sido sentenciado previamente por este Tribunal y por estudiosos del tema, el contenido de la precitada cláusula constitucional estuvo inspirado en el Art. 2 de la Declaración Universal de Derechos Humanos de las Naciones Unidas. *Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico*, 2019 TSPR 87, 202 DPR 428 (2019); *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791 (2014); De *Paz Lisk v. Aponte Roque*, 124 DPR 472 (1989). Véanse, además, J. J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pág. 11; J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. U.P.R., 1982,

Vol. III, pág. 174. En lo pertinente, el precitado artículo establece que "[t]oda persona tiene todos los derechos y libertades proclamados en esta Declaración, sin distinción alguna de raza, color, sexo, idioma, religión, opinión política o de cualquier otra índole, origen nacional o social, posición económica, nacimiento o **cualquier otra condición**". (Énfasis suplido).[24]

Establecido lo anterior, es menester señalar aquí que, de un análisis histórico relacionado al proceso de elaboración del Art. II, Sec. 1, de la Constitución del Estado Libre Asociado, *supra*, claramente se desprende que, en el texto originalmente propuesto por los miembros de la Comisión de la Carta de Derechos para lo que en su día sería la cláusula constitucional objeto de estudio, no se había incluido el concepto *condición social* como una de las instancias a ser protegidas por la mencionada disposición constitucional. El texto original rezaba de la siguiente manera: "[n]o podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas". 4 Diario de Sesiones de la Convención Constituyente 2561 (2003).[25] La

---

[24] *La Declaración Universal de los Derechos Humanos*, Naciones Unidas, https://www.un.org/es/universal-declaration-human-rights/.

[25] En lo relacionado al concepto origen social, en el Informe de la Comisión de la Carta de Derechos de la Convención Constituyente, se indicó que la inclusión del mismo: "reafirma el principio de descartar toda gradación, favoritismo o prejuicio al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivos de origen o **condición social**". (Énfasis suplido) 4 Diario de Sesiones, *supra*, pág. 2562. Al respecto, en el referido Informe también se señaló que:

terminología en cuestión -- entiéndase condición social -
- fue incluida posteriormente y de manera expedita,
mediante una enmienda propuesta al referido articulado por
el delegado Lino Padrón Rivera, la cual fue aprobada
prácticamente sin discusión. 2 Diario de Sesiones, *supra*,
pág. 1381.

Ahora bien, a pesar de la rápida aprobación de la
enmienda propuesta por el delegado Padrón Rivera para
añadir el concepto *condición social* a la cláusula
constitucional objeto de estudio, sí se desprende de las
discusiones suscitadas entre los miembros de la Asamblea
Constituyente que el delegado Jaime Benítez, presidente
de la Comisión de la Carta de Derechos, tuvo oportunidad
de expresarse sobre el significado de la misma. Así, de
forma contundente y en extremo importante para la correcta
disposición de las controversias ante nuestra
consideración, éste manifestó lo siguiente:

> [E]n las líneas quinta, sexta y séptima, se
> establece que "tanto las leyes como el sistema
> de instrucción pública encarnarán estos
> principios de esencial igualdad humana", y lo
> que se ha establecido aquí son ciertos principios
> básicos y esenciales que tienen fuerza ex
> proprio vigore, pero que además de tener fuerza
> por su propio vigor habrán de requerir
> implementación de dos clases, educativa y
> jurídica. En lo que toca a la educativa, ya hay

---

El propósito de esta sección es fijar claramente como base
consustancial de todo lo que sigue el principio de la dignidad del
ser humano y, como consecuencia de ésta, la igualdad esencial de
todas las personas dentro de nuestro sistema constitucional. **La
igualdad ante la ley queda por encima de accidentes o diferencias,
bien tengan su origen en la naturaleza o en la cultura.** Todo
discrimen o privilegio contrario a esta esencial igualdad repugna
al sistema jurídico puertorriqueño". (Énfasis suplido) 4 Diario
de Sesiones, *supra*, pág. 2561 (2003).

aquí un mandato al sistema de instrucción pública que habrá de respetar estos básicos principios. En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo. Y todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento. **En lo que toca a qué es lo que se quiere decir con origen social, quiérese decir con origen social, que no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal.** (Énfasis suplido) 2 Diario de Sesiones, *supra*, pág. 1382.

Sin temor a equivocarnos, de una lectura desapasionada de las palabras antes expresadas por el delegado Jaime Benítez, así como de las de otros miembros de la Asamblea Constituyente a los que aquí hemos hecho referencia, podemos colegir que el término condición social, según contemplado en el Art. II, Sección I, de la Constitución del Estado Libre Asociado de Puerto Rico, es uno que prohíbe cualquier tipo de discrimen o privilegio contrario al principio fundamental de igualdad que se manifiesta a través de toda nuestra Carta de Derechos. J. R. Roqué Velásquez, *Apuntes hacia una definición del discrimen por "origen o condición social" en Puerto Rico*, 39 Rev. Jur. UIPR 183, 187. Véase, además, A. Fernós-Isern, *Original Intent in the Constitution of Puerto Rico: Notes and Comments Submitted the Congress of the United States*, Hato Rey, 2da ed., Lexis-Nexis, 2002, pág. 35. Tal conclusión es cónsona con lo dispuesto en la Declaración

Universal de Derechos Humanos de las Naciones Unidas, texto inspirador de la cláusula constitucional que hoy es objeto de estudio.[26]

**En ese sentido, somos de la opinión, y el historial y debate de los miembros de la Asamblea Constituyente así lo demuestran, que la prohibición del discrimen por origen o condición social se manifiesta a través de dos vertientes: (1) aquella que prohíbe el prejuicio contra cualquier persona por su origen o estatus económico; y (2) <u>aquella que prohíbe el discrimen por condición social; entiéndase el *status* del individuo en la comunidad</u>. Véase, *Berberena v. Echegoyen*, 128 DPR 864 (1991) (Op. Disidente Juez Asociado Rebollo López). Es decir, incluye tanto aspectos económicos, como sociales.**

---

[26] Toda vez que los constituyentes rechazaron incluir la frase "posición económica" por entender que estaba cubierta dentro de la frase "origen o condición social", se ha argumentado que este concepto cobija únicamente el discrimen por características de índole económica. Sin embargo, esa conclusión no se desprende de un estudio detenido de la discusión plasmada en el Diario de Sesiones. Al respecto, en un momento dado de los debates en la Asamblea Constituyente, el delegado José Trías Monge propuso añadir la frase "posición económica", por ser la única enumeración que faltaba de las expresadas en la Declaración Universal de Derechos Humanos. 2 Diario de Sesiones, *supra*, pág. 1382. No obstante, ésta fue eliminada posteriormente, pues surgió la preocupación de que la frase podía impedir al Estado la implementación de iniciativas para beneficiar a personas de escasos recursos económicos. 3 Diario de Sesiones, *supra*, pág. 2244.

Ante estas preocupaciones, el delegado Víctor Gutiérrez Franqui señaló que "[c]reyendo que en su conjunto, la carta de derechos es suficiente para dejar establecido que no existirá discrimen de esa naturaleza en Puerto Rico aconsejo la eliminación de esa frase por considerarla peligrosa en el sentido que he indicado". 3 Diario de Sesiones, *supra*, pág. 2245. Véase también Roqué Velásquez, *supra*, págs. 185-187. Fue en ese contexto que el delegado Héctor González Blanes expresó que estaba conforme con "la eliminación de 'posición económica' porque entiendo que ahí está incluida la dificultad que levanta el compañero Reyes Delgado al ponerse más adelante origen o condición social". *Íd*.

Recordemos que, según estudiosos de este tema, el término condición social debe ser interpretado de forma amplia, pues "[e]llo iría acorde con la intención de nuestros constituyentes y armonizaría nuestro texto constitucional con la principal fuente de inspiración en cuanto nuestra política anti-discrimen: la Declaración Universal de los Derechos Humanos". J. M. Farinacci Fernós & G. Rivera Vega, *El uso de fuentes transnacionales en el derecho puertorriqueño (Parte I)*, 51 Rev. Jur. UIPR 189, 210-211 (2017).

B.

Cónsono con lo anterior, y consciente de que esta protección constitucional ha de esgrimirse únicamente frente al Estado, la Asamblea Legislativa decidió extender la misma al ámbito privado, en particular, al contexto laboral. De esta forma, con la aprobación de la Ley Núm. 100 de 30 de junio de 1959, 29 LPRA sec. 146 *et seq.* (en adelante, "Ley Núm. 100"), se creó una causa de acción contra todo patrono que discrimine o tome alguna acción contra un empleado, por razón de su raza, color, edad, origen o *condición social*. Dicha ley fue posteriormente enmendada para incluir las siguientes categorías: sexo; orientación sexual; identidad de género; origen nacional; afiliación política; ideas políticas o religiosas; ser víctima de violencia doméstica, agresión sexual o acecho; ser militar, exmilitar, servir o haber servido en las

Fuerzas Armadas de los Estados Unidos, o ser veterano.
*Íd.*[27]

**Así las cosas, y toda vez que la Ley Núm. 100 se creó con el propósito de extender la protección contra el discrimen contenida en nuestra Constitución al ámbito obrero-patronal, el análisis en torno al alcance de la referida disposición estatutaria debe considerarse análogo al de la cláusula constitucional en cuestión.** E. J. Rivera Juanatey, *Discrimen por antecedentes penales: Hacia una reconsideración del discrimen por condición social*, 41 Rev. Jur. UIPR. 585, 594 (2007).

### III.

De otra parte, es menester señalar también que el Art. II, Sección I, de nuestra Constitución establece que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". Const. PR., Art. II, sec. 7,

---

[27] El primer párrafo del Art. 1 de la referida ley, según ha sido enmendada hasta el día de hoy, lee como sigue:

> Todo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su status de empleado, por razón de edad, según ésta se define más adelante, raza, color, sexo, orientación sexual, identidad de género, origen social o nacional, condición social, afiliación política, o ideas políticas o religiosas, o por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, o por ser militar, ex-militar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o por ostentar la condición de veterano del empleado o solicitante de empleo. 29 LPRA sec. 146.

LPRA, Tomo 1. Según ha explicado este Tribunal anteriormente, "[e]sta disposición se activa cuando nos enfrentamos a una legislación o a una acción estadual que crea clasificaciones entre grupos, discriminando a unos frente a otros". *San Miguel Lorenzana v. E.L.A.*, 134 DPR 405, 424 (1993); *Berberena v. Echegoyen*, *supra*; *Zachry International v. Tribunal Superior*, 104 DPR 267 (1975).

Ahora bien, no todo discrimen contraviene esta disposición, toda vez que no se exige un trato igual para todos los ciudadanos y ciudadanas, sino que **<u>se prohíbe un tratamiento desigual injustificado</u>**. *Domínguez Castro v. E.L.A.*, 178 DPR 1 (2010); *Berberena v. Echegoyen*, *supra*; *Zachry International v. Tribunal Superior*, *supra*. Esto es así, pues, según señaló el prestigioso constitucionalista Raúl Serrano Geyls "el principio cardinal en que se funda constitucionalmente la igual protección de las leyes es el de 'trato similar para personas similarmente situadas'". R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1081-1082.

En esa dirección, hay dos aspectos esenciales a examinarse al realizar un análisis sobre igual protección de las leyes. El primero de ellos es la relación entre la clasificación establecida y el propósito que se quiere obtener mediante ésta; y el segundo es la importancia del derecho o interés afectado por la actuación de gubernamental. *Domínguez Castro v. E.L.A.*, *supra*;

*Berberena v. Echegoyen*, *supra*. Véase también, Serrano Gelys, *op. cit.*, pág. 1081.  A fines de evaluar la constitucionalidad de una ley a la luz de estos criterios, en nuestra jurisdicción se han desarrollado dos tipos de escrutinios judiciales: el escrutinio racional y el escrutinio estricto. *Berberena v. Echegoyen*, *supra*; *De Paz Lisk v. Aponte Roque*, *supra*; *P.I.P. v. C.E.E.*, *supra*.

El escrutinio racional, también conocido como tradicional o mínimo, se utiliza cuando la acción estatal objetada no establece clasificaciones sospechosas o no afecta derechos fundamentales. *San Miguel Lorenzana v. E.L.A.*, *supra*; *Berberena v. Echegoyen*, *supra*. Véase también, *López v. E.L.A.*, *supra*. En ese caso, la ley se presume constitucional si existe un nexo racional entre el propósito que se quiere alcanzar y la clasificación establecida. *Íd.* Siempre que exista una situación que razonablemente justifique la clasificación, la ley se considerará constitucional. *San Miguel Lorenzana v. E.L.A.*, *supra*; *Berberena v. Echegoyen*, *supra*; *Vélez v. Srio. de Justicia*, 115 DPR 533 (1984).

En cambio, el escrutinio estricto se utiliza cuando el tribunal determina que se estableció una clasificación sospechosa o que la clasificación hecha afecta algún derecho fundamental. *Lopez v. E.L.A.*, 165 DPR 280 (2005); *Berberena v. Echegoyen*, *supra*; *Zachry International v. Tribunal Superior*, *supra*. Bajo este cedazo, la ley o acción gubernamental impugnada se presume inconstitucional, recayendo

sobre el Estado el peso de probar que existe un interés apremiante que justifique la clasificación establecida. *Domínguez Castro v. E.L.A.*, *supra*; *López v. E.L.A.*, *supra*; *Berberena v. Echegoyen*, *supra*.

IV.

A.

Establecido lo anterior, cabe señalar aquí, como bien ha reconocido este Tribunal en ocasiones previas, que:

> [H]ay áreas en las cuales, por su tangencia con la dignidad humana y con el principio de que todo el mundo es igual ante la ley, toda clasificación es inherentemente sospechosa y está sujeta al más minucioso examen judicial. Estas áreas incluyen las clasificaciones o discrímenes por motivo de raza, color, sexo, nacimiento, origen o **condición social**, ideas políticas o religiosas y nacionalidad. *Wackenhut Corp. v. Rodríguez Aponte*, 100 DPR 518, 531 (1972). Véase, además, *Zachry International v. Tribunal Superior*, *supra*.

Cónsono con este razonamiento, existen argumentos a favor de considerar a las personas convictas de delito, que han cumplido su sentencia, como una clasificación sospechosa. Nos explicamos.

B.

Como se sabe, la doctrina que trata el tema de las clasificaciones sospechosas tiene su origen en la nota al calce número 4 de la Opinión emitida por el Tribunal Supremo de los Estados Unidos en *U.S. v. Carolene Products Co.*, 304 US 144 (1938). En ésta, se sugirió lo siguiente: "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." *U.S. v. Carolene*

*Products Co.*, *supra*, pág. 152, esc. 4. Dicho de otro modo, el prejuicio contra las minorías discretas e insulares puede ser una condición especial, la cual restringe el funcionamiento de los procesos políticos en los que precisamente se suele confiar para proteger a las minorías. Por ello, este tipo de situación puede requerir un examen judicial más riguroso.

A raíz de esa bien pensada nota, tanto desde los tribunales, como desde la Academia,[28] se ha dado bastante estudio y se le ha ido dando forma a la mencionada doctrina. En particular, se han establecido una serie de criterios para determinar qué constituye una clasificación sospechosa.

En apretada síntesis, los criterios a los que hemos hecho referencia pueden resumirse de la siguiente forma:

> En primer lugar, la sociedad en general le atribuye una clasificación o connotación negativa, ya sea por mitos, ignorancia o prejuicios, a los miembros de ese grupo, clase o individuos. En segundo lugar, a ese grupo, clase o individuos, se le ha sometido históricamente a un grado convincente de opresión en la sociedad. En tercer lugar, debe demostrarse evidencia del perjuicio o agravio. Bajo este esquema se trazaría una raya en términos de los grupos o individuos que puedan llenar estos requisitos. Roqué Velásquez, *supra*, págs. 197-198. Véanse, además, T. W. Simon, *Suspect Class Democracy: A Social Theory*, 45 U. Miami L. Rev. 107 (1990); B. Geiger, *The Case for Treating Ex-Offenders as a Suspect Class*, 94 Calif. L. Rev. 1191 (2006).

Al trasladar los criterios antes expuestos a los hechos ante nuestra consideración, y particularmente en lo referente al primero de los criterios, notamos que las personas convictas de delitos constituyen una población

---

[28] En especial por John Hart Ely en su libro *Democracy and Distrust: A Theory of Judicial Review*.

que históricamente ha sido marginada. "[E]n nuestra sociedad, cuando a una persona se le condena públicamente por haber cometido un delito, se le impone también un estigma social que, en la mayoría de las ocasiones, nunca desaparece, aun cuando la condena ha sido cumplida". *Rosario v. Toyota*, *supra*, pág. 21. (Op. de Conformidad del Juez Asociado señor Rebollo López).

De otra parte, y en lo relacionado al segundo de los criterios, como consecuencia de ese estigma, las personas convictas de delito han sufrido un grado convincente de opresión social. Ello, particularmente en el ámbito laboral, donde tienden a perder acceso a buenas oportunidades de trabajo, debido a sus antecedentes penales. La dificultad para integrarse en la fuerza laboral coarta sus oportunidades de movilidad social, política y económica, lo que, a su vez, dificulta su plena rehabilitación. Roqué Velásquez, *supra*, pág. 198.

Por último, y en cuanto al tercero de los criterios, la evidencia de perjuicio o agravio, las personas convictas de delito podrían fácilmente satisfacer este criterio acreditando la "negación de empleo a la persona, negación de servicios públicos o beneficios, privilegios injustos que se le ofrezcan a otras personas igualmente situadas, etc.". *Íd*. Tal como sucede en estos días.

Así pues, a la luz de este análisis, no albergamos duda alguna de que las personas convictas de delito deben ser consideradas como una clasificación sospechosa para fines de la igual protección de las leyes al amparo de nuestra Constitución.

V.

Dicho ello, precisa señalar también que el Art. VI, Sección 19, de la Constitución del Estado Libre Asociado de Puerto Rico establece como política pública de nuestro gobierno el "reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes **para hacer posible su rehabilitación moral y social**". (Énfasis suplido) Const. PR. Art. VI, sec. 19, LPRA, Tomo 1. Cónsono con ello, el Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, según enmendado, 3 LPRA Ap. XVIII, dispone en su Art. 2 que:

> Con la aprobación de este Plan, se decreta como **política pública del Gobierno de Puerto Rico** la creación de un sistema integrado de seguridad y administración correccional donde las funciones y deberes se armonicen en un proceso facilitador a la imposición de penas y medidas de seguridad, así como a la custodia de los ciudadanos que han sido encontrados incursos en la comisión de un delito o falta y **que establezcan procesos de rehabilitación moral y social del miembro de la población correccional o transgresor, a fin de fomentar su reincorporación a la sociedad.** (Énfasis suplido) 3 LPRA Ap. XVIII, sec. 2.

Como puede apreciarse, la rehabilitación de aquellos que han sido convictos por la comisión de un delito es un valor de muy alta jerarquía en nuestro ordenamiento jurídico. Su importancia es tal, que es el "único fin de la pena con rango constitucional". E. L. Chiesa Aponte, *El crimen, la reforma penal y el P. del S. 1229*, 62 Rev. Jur. U.P.R. 151, 152 (1993).

Este énfasis en la rehabilitación y la reintegración social es de beneficio tanto para el individuo como para el resto de la ciudadanía, pues es el mejor remedio contra la reincidencia.D. F. Flake, *When Any Sentence Is a Life Sentence: Employment Discrimination against Ex-Offenders*, 93 Wash. U. L. Rev. 45, 62-64 (2015); Chiesa Aponte, *supra*, pág. 62. No obstante, este es un valor que se queda corto en la praxis.

Como bien sintetizó el historiador Fernando Picó:

> [A]ún hoy prevalece una suerte de inhabilitación civil, ya que en un país donde el estado es el principal patrono, el gobierno no emplea a los egresados de presidio. Es por esta calificación que los solicitantes para empleo público deben obtener un certificado de buena conducta de la policía. Muchos patronos de la empresa privada exigen el mismo certificado, y así se cierran las oportunidades de empleo para los confinados. F. Picó, *El Día Menos Pensado: Historia de los Presidiarios en Puerto Rico (1793-1993)*, Río Piedras, Ed. Huracán, 1994, pág. 172.

Dicha "inhabilitación civil", a la que hace referencia el historiador Fernando Picó, no sólo afecta directamente a los exconvictos en su proceso de reintegración a la libre comunidad, sino que, además, les dificulta el sostenimiento y desarrollo de sus familias. Véase, S. J. Mullings, *Employment of Ex-Offenders: The Time has Come for a True Antidiscrimination Statute*, 64 Syracuse L. Rev. 261, 267 (2014) ("Research suggests that the reduced economic prospects of incarcerated parents will reduce the economic mobility of their children.").

Ante el cuadro desalentador previamente descrito, concluimos que es errado despojar de la protección constitucional y estatutaria contra el discrimen por condición social a las personas convictas de delito, quienes están sometidas a un trato desigual y son marginadas, precisamente, por su condición en la comunidad. Más aun, el permitir que los patronos discriminen contra esta población a la hora de buscar un empleo que les permita su sostenimiento y reintegración social, es incompatible con la obligación del Estado de rehabilitar a los transgresores para así garantizar la seguridad de la sociedad.

VI.

No empece lo antes dicho, es menester recordar que, si bien al interpretar el Art. II, Sección I de la Constitución del Estado Libre Asociado de Puerto Rico, y por ende, el alcance de la precitada Ley Núm. 100, debemos tomar en consideración el fin de proteger a los trabajadores contra el discrimen en el empleo y en el reclutamiento -- interpretando las disposiciones pertinentes de la manera más favorable a la víctima del discrimen --, "[e]llo no significa […] que no se tenga que realizar un adecuado balance entre tal protección a los empleados y el valor e interés patronal, también protegido, de velar por las prerrogativas gerenciales que el sistema económico le reconoce a este último". *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 381-382 (2001).

Con este balance en mente, algunas jurisdicciones de los Estados Unidos han aprobado legislación que requiere a los patronos, en casos de solicitantes con un historial de antecedentes penales, considerar evidencia de rehabilitación del candidato y si su historial está directa o sustancialmente relacionado a la posición de trabajo que solicita. Geiger, *supra*, pág. 1240. Aunque en su mayoría se trata de disposiciones sumamente generales, algunos establecen unos criterios más concretos. El estado de Nueva York, por ejemplo, establece los siguientes criterios:

> (1) the state's public policy to encourage the licensure and employment of ex-offenders; (2) the specific duties and responsibilities of the license or employment; (3) how the individual's criminal record would affect his ability to perform those specific duties and responsibilities; (4) the amount of time that has passed since the crime was committed; (5) how old the person was at the time of the crime; (6) the seriousness of the offense; (7) evidence of rehabilitation or good conduct; and (8) the employer's legitimate interest in protecting both property and the safety and welfare of specific individuals or the general public. D. F. Flake, *supra*, pág. 87.[29]

---

[29] El texto literal de la disposición lee de la siguiente forma:

> (a) The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.
>
> (b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.
>
> (c) The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.
>
> (d) The time which has elapsed since the occurrence of the criminal offense or offenses.

Asimismo, la *U.S. Equal Employment Opportunity Commission* ha establecido tres (3) factores que debe mostrar el patrono ante una reclamación al amparo del Título VII de la Ley de Derechos Civiles de 1964, 42 USC secs. 2000e *et seq.*, cuando a un patrono se le imputa un despido o rechazo por motivo de una política o práctica en cuanto a las convenciones criminales que tiene un impacto adverso en la clase protegida a la cual pertenece el o la demandante. En estos casos, para establecer una defensa de "*bussines necessity*" el patrono debe demostrar que consideró: (1) la naturaleza y gravedad de la ofensa; (2) el tiempo transcurrido desde la convicción o la culminación de la sentencia; y (3) la naturaleza del empleo que la persona tiene o solicita. *EEOC Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1982)*, (https://www.eeoc.gov/policy/docs/convict1.html).

---

(e) The age of the person at the time of occurrence of the criminal offense or offenses.

(f) The seriousness of the offense or offenses.

(g) Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

(h) The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public. N.Y. Correct. Law sec. 753.

Sin lugar a dudas, los criterios presentados pueden servir como mecanismo para establecer un adecuado balance entre la protección de las personas convictas de delito contra el discrimen en la esfera laboral y los intereses que el sistema económico le reconoce a los patronos. Éstos no sólo pueden servir para establecer defensas ante una reclamación al amparo de la Ley Núm. 100, sino que -- mejor aún -- pueden ofrecer una guía para un tratamiento más justo de una población que ha sido históricamente marginada en el ambiente laboral.

Es, pues, a la luz de la normativa antes expuesta, y no de otra, que procedemos a resolver la controversia ante nuestra consideración.

VII.

En el presente caso, nos corresponde determinar si el doctor Garib Bazaín fue víctima de discrimen en el empleo por su condición de persona convicta de delito. Según surge de los hechos antes reseñados, a éste le fueron denegados ciertos privilegios clínicos por parte del Hospital Español Auxilio Mutuo, lo que equivale a negarle trabajo en dicha institución hospitalaria. Ello, en esencia, a raíz de su previa convicción criminal en la jurisdicción federal.[30]

---

[30] Ahora bien, lo anterior no es óbice para reconocer que al momento en que se le denegó el otorgamiento de privilegios médicos al doctor Garib Bazaín, y según se desprende de la carta que le fue cursada a éste, el Hospital Español Auxilio Mutuo tuvo ante sí ciertos elementos de juicio adicionales que este Tribunal no evaluó al momento de disponer del presente caso. Ello, pues la opinión mayoritaria se limitó a validar la utilización de convicciones previas como criterio para denegar una oportunidad de empleo.

Como ya mencionamos -- por estar sobre la mesa importantes derechos constitucionales y estatutarios que, al momento de la denegatoria de privilegios para poder laborar en el Hospital Auxilio Mutuo, cobijaban al doctor Garib Bazaín --, actuaciones como éstas deben ser evaluadas bajo el crisol de un escrutinio estricto. Ello es así, pues, en la medida en que las protecciones extendidas a los trabajadores y trabajadoras por Ley Núm. 100 surgen directamente de nuestra cláusula constitucional contra el discrimen, éstas deben ser examinadas bajo el mismo rigor que exige un escrutinio estricto correspondiente al análisis constitucional del que derivan.

Bajo ese escrutinio, recaía en la institución hospitalaria el peso de probar que existía un interés apremiante que justificase la clasificación establecida por éstos al momento de decidir si le concedía o no privilegios a un médico, en este caso al doctor Garib Bazaín. Contrario a lo que se señala en la Opinión que hoy emite este Tribunal, ello no sucedió aquí.

**Como mencionamos anteriormente, las convicciones criminales, independientemente del contexto en que se producen, implican un estigma con connotaciones sumamente negativas que relegan a la persona convicta a un "status" de inferioridad en la sociedad, aun luego de haber cumplido su pena. El hecho de tener antecedentes penales permite que a estas personas se les niegue de plano**

**oportunidades, particularmente en la esfera laboral, sin que se consideren tan siquiera sus méritos y aptitudes. Ello, a su vez, coarta sus oportunidades de movilidad social, política y económica, lo que dificulta su plena rehabilitación, valor de muy alta jerarquía en nuestro ordenamiento jurídico.**

En fin, somos del criterio que realizar una interpretación limitada de la frase condición social, según recogida en el Art. II, Sección I, de nuestra Constitución, como la que hoy hace una mayoría de este Tribunal, redundará en despojar de protección constitucional a ciertos sectores de nuestra población que a lo largo de nuestra historia han sido marginados, uno de ellos precisamente lo son las personas convictas de delito. **A ello, en nuestra función de últimos intérpretes de la Constitución del Estado Libre Asociado de Puerto Rico, no estamos dispuestos.**

VIII.

Es pues por todo lo anterior que respetuosamente disentimos.

Ángel Colón Pérez
Juez Asociado